1   JOSEPH W. COTCHETT (#36324)
    jcotchet@cpsmlaw.com
2   MARK C. MOLUMPHY (#168009)
    mmolumphy@cpsmlaw.com
3   KELLY L. SOMMERFELD (#234025)
    ksommerfeld@cpsmlaw.com
4   COTCHETT, PITRE, SIMON & McCARTHY
    840 Malcolm Road, Suite 200
5   Burlingame, CA 94010
    Telephone: (650) 697-6000
6   Fax: (650) 697-0577

7   *Co-Lead Counsel for Lead Plaintiffs and Class*

8   DAVID A.P. BROWER
    brower@browerpiven.com
9   ELIZABETH A. SCHMID
    schmid@browerpiven.com
10  BROWER PIVEN
    A Professional Corporation
11  488 Madison Avenue, 8th Floor
    New York, NY 10022
12  Telephone: (212) 501-9000
    Fax: (212) 501-0300

13

14  *Co-Lead Counsel for Lead Plaintiffs and Class*

    CHARLES PIVEN                          SETH A SAFIER (#197427)
15  piven@browerpiven.com                  seth@gutridesafier.com
    BROWER PIVEN                           MICHAEL R. REESE (# 206773)
16  A Professional Corporation             michael@gutridesafier.com
    401 East Pratt Street, Suite 2525      GUTRIDE SAFIER LLP
17  Baltimore, MD 21202                    835 Douglas Street
    Telephone: (410) 332-0030              San Francisco, CA 94119
18  Fax: (410) 685-1300                    Telephone: (415) 336-6545
                                           Fax: (415) 876 - 4345

19  *Co-Lead Counsel for Lead Plaintiffs and Class*      *Plaintiffs Liaison Counsel*

20

21                    UNITED STATES DISTRICT COURT

22                  NORTHERN DISTRICT OF CALIFORNIA

23                                          )   Master File No. 06-4595-PJH
                                            )
24  **IN RE FOXHOLLOW TECHNOLOGIES,**       )   **CONSOLIDATED COMPLAINT FOR**
    **INC. SECURITIES LITIGATION**          )   **VIOLATIONS OF FEDERAL**
25                                          )   **SECURITIES LAWS**
                                            )
26  _____        )   JURY TRIAL DEMANDED

27

28

1   Plaintiffs allege as follows upon information and belief based upon, *inter alia*, the

2   investigation conducted by plaintiffs' counsel, except as to those allegations pertaining to

3   plaintiffs personally, which are alleged upon knowledge.  The investigation of their counsel

4   included, among other things, a review of FoxHollow Technologies, Inc.'s ("FoxHollow" or the

5   "Company") financial condition, documents pertaining to FoxHollow and Lumend, discussions

6   with consultants, as well as regulatory filings, reports, press releases and media reports about

7   FoxHollow.  Plaintiffs believe that substantial evidence exists for the allegations set forth in this

8   Complaint.

9   **I.    OVERVIEW**

10   1.    Plaintiffs bring this action on behalf of all persons and entities who purchased

11   FoxHollow common stock from May 13, 2005 through January 26, 2006 (the "Class Period")

12   and suffered damages (the "Class").

13   2.    FoxHollow was founded by defendant John Simpson in 1996.  It is based in

14   Redwood City, California.  FoxHollow's sole product is a medical device called the SilverHawk,

15   used to treat peripheral artery disease or PAD.  The catheter device is like a Roto-Rooter.  It is

16   inserted inside a clogged artery, and a spinning blade within the catheter is switched on to cut

17   through and remove plaque.

18   3.    In 1996, at the same time Simpson formed FoxHollow, he formed another

19   company called Lumend, Inc.  Lumend is also based in Redwood City.  It has one primary

20   product, called the Frontrunner, which is a catheter device inserted into an artery to penetrate

21   plaque blockages and treat PAD.  However, unlike FoxHollow's device, Lumend's device does

22   not remove the plaque, but merely creates an opening for other treatments to then be used.

23   4.    Simpson, who had successfully formed other medical device companies and sold

24   them for millions of dollars, spent several years trying to gauge the respective businesses of

25   FoxHollow and Lumend, with contrasting results.  Ultimately, given the superiority of the

26   FoxHollow technology and market interest, Simpson decided to only take FoxHollow public.

27   5.    In October 2004, FoxHollow commenced an initial public offering at $14 per

28   share.  Overnight, Simpson's founders' stock – like that of his friends, family and medical

colleagues who also invested pre-IPO – was worth millions. Over the next year, as FoxHollow reported record revenues on a quarterly basis, and lauded the role of its senior management team in the Company's continuing success, its stock price more than tripled in value, surpassing $50 per share by July 2005. It continued to trade between $45 and $55 for months thereafter, amidst continuing positive reports about the Company's award-winning senior staff.

6.     Unfortunately, Simpson was not content with the singular success of FoxHollow. In 2005, Simpson, while serving as Chairman of the Board and a paid "consultant" to the Company, ordered FoxHollow's senior management to use the Company's assets to acquire Lumend. The acquisition made no sense, involved inferior technology, and was designed solely to benefit Simpson and his friends and family. Accordingly, certain members of FoxHollow's senior management balked at the deal, despite threats from Simpson and his allies on the Board that they would be replaced if they refused to go along with Simpson's edict. This material information was concealed from the public.

7.     Simpson, who was forced to sell Lumend at a lower price, then carried out his threat and purged FoxHollow of its "disloyal" management. The news was devastating to FoxHollow and its shareholders. After trading closed on Monday, December 12, 2005, while the Company was reporting record sales and revenues, and without any prior notice of discontent with management, FoxHollow announced that its Board had decided to make a "change" in management and replace Robert Thomas, the Company's President and CEO, with Simpson just two weeks later, on January 1, 2006. On the news, FoxHollow's share price plunged from $46.12 to $38.97 the next trading day on ten times ordinary volume. Within one week, FoxHollow was trading below $31 per share, a loss of *one-third* of its market capitalization or over *$375 million*.

8.     Then, without warning after the close of trading on January 25, 2006, FoxHollow announced that David Martin, the Chief Operating Officer, and William Hoffman, the Vice President of Sales, were also going to be replaced. FoxHollow reported that Duke Rohlen, Simpson's son-in-law, who had no prior public management experience, had been promoted to President of Strategic Operations and Matt Ferguson, Rohlen's brother-in-law, was remaining as

1    CFO.  Over the next three days, FoxHollow's share price fell from $27.34 to a low of $23.35,

2    another 15% loss.

3        9.      Together, after disclosure of the management purge, plaintiff and Class members

4    lost *50%* of their stock value in just over one month.  The total market value loss is estimated at

5    over ***$600 million***.  By this action, plaintiff seek to recover damages for this conduct in violation

6    of federal securities laws.

7    **II.    JURISDICTION, VENUE AND SAFE HARBOR**

8        10.     Plaintiffs bring this action pursuant to Sections 10(b) and 20(a) of the Securities

9    Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.  This Court has jurisdiction over

10   this action pursuant to §27 of the 1934 Act (15 U.S.C. §78aa).

11       11.     Venue is proper in this district.  Defendant FoxHollow resides and conducts

12   business in this District.  The Individual Defendants reside and conduct business in this District.

13   A substantial part of the events, acts, omissions and transactions complained of herein, including

14   the concealment of information to plaintiff and the Class, occurred in this District.  At all

15   relevant times herein, defendants conducted substantial business and/or committed violations of

16   United States law by acts committed in this District.

17       12.     The statutory safe harbor provided for forward-looking statements under certain

18   circumstances does not apply to the defendants' material omissions alleged in this Complaint.

19   Defendants' omissions were not identified as forward-looking statements, they were not

20   accompanied by meaningful cautionary statements identifying important factors which could

21   cause actual results to differ materially from those in forward-looking statements, or they were

22   not forward-looking statements within the meaning of the statute.  Alternatively, to the extent any

23   omissions or statements pleaded herein are considered to be "forward-looking," defendants are

24   liable because at the time each was made, the speaker knew that the statement was false and the

25   statement was authorized and/or approved for issuance by the defendant who knew that those

26   statements were false when made.

27

28

**III.**     **THE PARTIES**

13.     Lead Plaintiff Margaret Kovarik purchased FoxHollow common stock during the Class Period and was damaged thereby.

14.     Lead Plaintiff Matthew Roberts purchased Foxhollow common stock during the Class Period and was damaged thereby.

15.     Margaret Kovarik and Matthew Roberts are collectively referred to herein as "Plaintiffs."

16.     Defendant FoxHollow Technologies, Inc. is a corporation organized under the laws of Delaware, with principal executive offices at 740 Bay Road, Redwood City, California.

17.     Defendant John B. Simpson is the CEO and a director of FoxHollow.  Simpson founded FoxHollow in September 1996 and has served as a member of its Board of Directors from September 1996 to the present.  From October 1996 to July 1997, Simpson served as President of FoxHollow.  From May 2004 to December 2005, Simpson served as a paid consultant to FoxHollow.  From January 2005 to June 5, 2006, Simpson served as the Interim CEO and then became the permanent CEO.   Simpson, along with his family members and related trusts, companies, and venture capital funds, is also a large and controlling shareholder of FoxHollow and sold thousands of shares during the Class Period.

18.     Defendant Matthew B. Ferguson has served as the CFO of FoxHollow since January 2004, and the Vice President of Finance and Business Development from July 2002 to January 2004.  Ferguson is also the brother-in-law of Duke Rohlen, Simpson's son-in-law.  Like Simpson, Ferguson held thousands of shares and options at FoxHollow and sold thousands of shares during the Class Period.

19.     Simpson and Ferguson are referred to herein as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of FoxHollow's quarterly and annual reports and other SEC filings, press releases, presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after

their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them but not to the public, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading. The Individual Defendants are liable for the concealments and false statements pleaded herein, as those concealments and statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

20.    Plaintiffs are ignorant of the true names of defendants sued as Does 1 through 10, inclusive, and therefore sues these defendants by such fictitious names and will seek leave of the Court to amend this Complaint to allege their true names and capacities when they are ascertained. Plaintiffs allege that each of the Doe Defendants is responsible for the acts alleged in this Complaint and that Plaintiffs' damages were caused by the Doe Defendants.

21.    Defendant, and the Doe Defendants, and each of them, are individually sued as participants and as aiders and abettors in the improper acts, plans, schemes, and transactions, to induce plaintiffs to purchase the debt securities that are the subject of this Complaint.

22.    Various other people, firms, and corporations, presently unknown to Plaintiffs and sued herein as Does 1 through 10 in this Complaint, have participated as members of the alleged scheme or acted in furtherance of it, or aided or assisted in carrying out its purposes as alleged in this Complaint, and have performed acts and made statements in furtherance of the violations and conspiracy.

23.    At all relevant times, each Defendant was and is the agent of each of the remaining Doe Defendants, and in doing the acts alleged herein, was acting within the course and scope of such agency. Each Defendant ratified and/or authorized the wrongful acts of each of the other Doe Defendants.

## IV.   CLASS ALLEGATIONS

24.    Plaintiffs bring this action as a class action under Federal Rule of Civil Procedure, Rule 23.  The Class is defined as all persons and entities who purchased FoxHollow common stock from May 13, 2005 through January 26, 2006 and suffered damages (the "Class").  Excluded from the Class are the defendants herein, and the subsidiaries, parents, affiliates, family members and/or controlled persons or entities of each defendant.

25.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at the present time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds of members of the Class located throughout the United States.  Throughout the Class Period, FoxHollow had approximately 25 million shares of common stock outstanding, which were actively traded on the Nasdaq National Market in an efficient market.

26.    Plaintiffs' claims are typical of the claims of the members of the Class, as Plaintiffs and the Class were victimized by the same scheme and induced to purchase the common stock based upon the same misrepresentations and omissions, and were damaged thereby.

27.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests which are contrary to or in conflict with those of the Class members they seek to represent.

28.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members to individually seek redress for the wrongs done to them.  Plaintiffs know of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

29.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Common questions of law and fact exist as to all members of the Class,

and predominate over any questions affecting solely individual members of the Class.  Among

questions of law and fact common to the Class are:

> a.  whether the federal securities laws were violated by defendants' acts and
>      omissions as alleged herein;
>
> b.  whether defendants misstated and/or failed to disclose material facts in
>      their public statements and filings;
>
> d.  whether defendants participated directly or indirectly in the course of
>      conduct alleged and whether they acted with scienter;
>
> e.  whether Class members were damaged and the proper measure of
>      damages.

## V.   STATEMENT OF FACTS

### A.   1996: Simpson Forms FoxHollow and Lumend

30.   In 1996, Simpson formed FoxHollow to market a device used to treat peripheral

artery disease or PAD.  The device is called the SilverHawk and collects and removes plaque in

order to reopen narrowed or blocked arteries.

31.   Similarly, in 1996, at the same time he was forming FoxHollow, Simpson formed

another private company called Lumend, along with Matthew Selmon.  For years, Selmon has

been Simpson's medical partner at a private cardiology practice in Redwood City, near Sequoia

Hospital.

32.   Similar to FoxHollow, Lumend's primary product was called the Frontrunner,

which is a catheter used by physicians to penetrate and "cross" an occlusion or blockage in the

artery.   Unlike the SilverHawk, the Frontrunner simply crosses the blockage so that other

treatments, such as angioplasty or stents, can be used to treat the problem.  The Frontrunner does

not actually remove the plaque.

33.   Lumend has other similarities with FoxHollow.  Before its IPO, FoxHollow was

financially backed by Simpson, through his affiliated venture capital firm called De Novo

Ventures.  De Novo, which is based in Menlo Park, also was one of the primary investors in

Lumend.  De Nova was co-founded in 2000 by Simpson and Richard Ferrari.  Ferrari also served on FoxHollow's Board of Directors until 2005.

34.     Simpson used De Novo Ventures to fund several different companies including Guidant, Perclose and Prolithics.   Each of these companies were working to develop technology in the biotechnology and medical device industries and, at times, operated under the same roof.  For example, Lumend and Fox Hollow initially operated out of the same office building, located at 167 Constitution Drive, Menlo Park, California with employees of both companies literally working side by side.

35.     Tomoaki Hinohara, who also practices with Simpson and Selmon in Redwood City, helped to invent and develop the Lumend technology and is listed as a co-inventor on several patents issued to or patent applications made by Lumend.  Mr. Hinohara is also an interventional cardiologist at Stanford University, where Dr. Simpson works as a Professor of Clinical Medicine.  Both Simpson and Hinohara previously served on the Board of Perclose Inc..  Hinohara serves as a director at FoxHollow.

36.     Douglas S. Rohlen or "Duke" Rohlen is Simpson's son-in-law and the brother-in-law of defendant Ferguson, Fox Hollow's CFO.   Neither Rohlen nor Ferguson had served as an officer or director of a public company.  Before joining FoxHollow, Rohlen worked as the Director of Business Development at Lumend for his father-in-law.

37.     Unlike FoxHollow's Silverhawk technology, Lumend was a market failure and failed to make significant inroads into the PAD treatment market.  Its Frontrunner device was also inferior to other treatment alternatives available to physicians, including the SilverHawk.

38.     Accordingly, after receiving clearance from the FDA to market the SilverHawk, Simpson devoted his efforts to FoxHollow's business.  Between 2003 and 2004, Simpson directed management to build a direct sales force organization and initiate sales to medical centers.  With the efforts of Robert Thomas, CEO, David Martin, COO, and William Hoffman, Vice President of Sales Thomas, FoxHollow then introduced its product to the United States, with significant success.  By September 2004, Fox Hollow had 217 employees and had just completed a move into a 61,000 square foot facility in Redwood City.

**B.     2004: Simpson Takes FoxHollow Public**

39.     In September 2004, FoxHollow commenced filings with the SEC to take the Company public.

40.     At the time, the Company's senior management included Thomas, CEO, Matt Ferguson, CFO, Martin, COO, and Hoffman, Vice President of Sales.  The Company's Board included Simpson, Hinohara, Ferrari, Thomas, Ryan Drant and Sanford Fitch.  In addition, in May 2004, FoxHollow and Simpson entered into a consulting agreement whereby Simpson was paid $25,000 per month to provide consulting services.

41.     On or about October 28, 2004, FoxHollow filed its Registration Statement and Prospectus to initiate its initial public offering.  FoxHollow offered 4.5 million shares of its common stock at an initial price of $14.00 per share.  At the time, according to the Prospectus, De Novo held 2,075,173 shares and 32,451 options and warrants, representing 12% of the Company before the IPO and 9.5% after the IPO.  Simpson held 7,814,693 shares and 117,061 options and warrants, representing 44.8% before the IPO and 35.7% after the IPO.

42.     On December 6, 2004, FoxHollow filed with the SEC its Form 10-Q for the third quarter ending September 30, 2004.  The Company announced that net revenues were $11.6 million for the first three months ended September 30, 2004, compared to $650,000 for the three months ended September 30, 2003.  The Company announced that net revenues were $23.9 million for the nine months ended September 30, 2004, compared to $876,000 for the nine months ended September 30, 2003.  The Company disclosed that its IPO completed on October 28, 2004 had sold 4.5 million shares at $14.00 per share, and on October 29, 2004, the underwriters had exercised their over-allotment option to purchase 675,000 shares at $14.00 per share.  Proceeds from the offering were about $67.4 million.

43.     On February 14, 2005, FoxHollow filed with SEC its Form 8-K, and issued a related press release, announcing its fourth quarter 2004 and year end results.  The Company announced that its fourth quarter revenues were $14.7 million, a 27% increase over the $11.6 million reported for third quarter of 2003.  For the full year, FoxHollow reported net revenues of $38.6 million, compared to $2.6 million for 2003.

44.     On March 28, 2005, FoxHollow filed with the SEC its Form 10-K, reiterating these financial results.  The Company also disclosed that, as of December 31, 2004, it had increased its staff to 244 employees noting that "We believe that our future success will depend on our continued ability to attract, hire and retain qualified personnel."  The Company also disclosed that the Board's Compensation Committee had increased the salary of Thomas, its CEO, from $275,000 to $300.000, and the salary of Martin, its COO, from $175,000 to $225,000, and in addition, approved a bonus plan whereby these executives would be eligible for cash bonuses in the event certain key performance targets were met or exceeded.

45.     On April 8, 2005, FoxHollow issued a press release announcing that lock-up agreements entered into in conjunction with the IPO would be extended 19 days, or until May 14, 2005, and the first sales of restricted shares could take place on May 16, 2005.  The lock-up period had been due to expire on April 26, 2005, based on the planned timing of FoxHollow's quarterly earnings release.  However, the release was delayed until April 17, 2005.  The extension affected about 17.7 million shares of stock, much of it owned by the Individual Defendants or their affiliates.

46.     On April 27, 2005, Fox Hollow filed with the SEC its Form 8-K, and issued a related press release, announcing its financial results for the first quarter of 2005 ended March 31, 2005.  The Company announced that its revenue was $21.5 million, which was a 46% increase over revenue of $14.7 million in the fourth quarter of 2004 and a 350% increase over first quarter 2004 revenue of $4.8 million.  The Company reported a gross margin of 59% for the first quarter of 2005 versus 52% in the fourth quarter of 2004 and 14% in the first quarter of 2004.  Net loss for the quarter was $6.5 million, compared with a net loss of $7.5 million in the fourth quarter of 2004.  Robert Thomas stated, "These results reflect FoxHollow's success in developing and penetrating the market for treating PAD and our ability to grow our sales force and manufacturing capacity, as well as the compelling patient outcomes achieved with our device."  Thomas also noted that FoxHollow ended the quarter with 89 direct salespeople, compared with 69 in the fourth quarter of 2004, and was on track to have about 125 sales professionals by the end of 2005.

47.     On April 29, 2005, FoxHollow filed with the SEC its Schedule 14A Proxy Statement, giving notice of its 2005 annual meeting to be held on June 16, 2005.  The Proxy also included a summary compensation table for FoxHollow's senior executives in 2003 and 2004, indicating that Thomas, Martin and Hoffman all received raises in 2004, along with cash bonuses and long term stock option awards.  In the Compensation Committee's report, it noted that Thomas' salary for 2004 was based on Thomas' qualifications, knowledge and experience and his individual performance at FoxHollow.

## C.   2005-2006: The False And Misleading Statements

48.     On May 13, 2005, FoxHollow filed with the SEC its Form 10-Q for the first quarter of 2005, signed by defendant Ferguson.  FoxHollow reported its financial results for the first quarter, including record quarterly revenues.  Notably, within the litany of "Factors Affecting Future Operating Results" listed by FoxHollow in its 10-Q, and repeated in all future 10-Qs filed with the SEC during the Class Period, were the following:

> **We depend on skilled and experienced personnel to operate our business effectively.  If we are unable to recruit, hire and retain these employees, our ability to manage and expand our business will be harmed, which would impair our future revenue and profitability.**
>
> *Our success largely depends on the skills, experience and efforts of our officers and other key employees.  Any of our officers and other key employees may terminate their employment at any time.  The loss of any of our senior management team could harm our business.*  Our ability to retain our skilled labor force and our success in attracting and hiring new skilled employees will be a critical factor in determining whether we will be successful in the future.  We may not be able to meet our future hiring needs or retain existing personnel.  We will face particularly significant challenges and risks in hiring, training, managing and retaining engineering and sales and marketing employees.  Failure to attract and retain personnel, particularly technical and sales and marketing personnel, would harm our ability to compete effectively and grown our business.  *The announcement of the loss of one of our key employees could negatively affect our stock price.*"

The Company also stated:

> **"If we make acquisitions or divestitures, we could encounter difficulties that harm our business.**
>
> We may acquire companies, products or technologies that *we believe to be complementary to the present or future direction of our business*.  If we engage in such acquisitions, we may have difficulty integrating the acquired personnel, financials, operations, products or technologies.  *Acquisitions may dilute our earnings per share, disrupt our ongoing business, distract our management and*



*employees and increase our expenses, which could harm our business.*  If we use our common stock to acquire companies, products or technologies, it may substantially dilute the percentage of the company held by stockholders who own securities prior to the acquisition."

Emphasis in bold in original; emphasis in italics added.

49.     These same disclosures were made in other filings made during the Class Period. FoxHollow readily acknowledged the material aspects of these specific risks – loss of key management and devotion of resources to acquisitions – to the Company's viability, operations, financial performance and stock price.  As key risks to FoxHollow, all material information relating to these risks should have been disclosed to the public.

50.     On May 18, 2005, Thomas, FoxHollow's CEO, was given the top award – the Platinum ABBY – at the Seventh Annual Innovations in Healthcare event and awards ceremony in Orange, California.  The award was presented by the Adaptive Business Leaders Organization, comprised of CEOs and Presidents of healthcare and technology firms in the United States.  A news release of the award, published on PRNewswire on May 19, 2005, stated that Thomas was recognized for his work at FoxHollow, including $40 million in revenues and going public over the past 12 months.

51.     During the ten-day trading period, between May 16, 2005 and May 26, 2005, FoxHollow's share price climbed from about $30 per share to $40 per share on heavy volume.

52.     On June 20, 2005, FoxHollow filed with the SEC a Form 8-K and issued a press release announcing that defendant Jeffrey Child was appointed to the Board of Directors to fill a vacancy created by Richard Ferrari, who resigned on June 17, 2005.  FoxHollow did not disclose that Child was a close friend and neighbor of defendant Ferguson.

53.     On July 27, 2005, FoxHollow filed with the SEC a Form 8-K and issued a press release announcing its financial results for the second quarter of fiscal year 2005 ended June 30, 2005, including revenue for the quarter of $28.7 million, a 33% increase over revenues of $21.5 million in the first quarter of 2005, and a 283% increase over revenues of $7.5 million in the second quarter of 2004.  The Company also reported a gross margin of 69% in the second quarter, versus 59% in the first quarter of 2005 and 19% in the second quarter of 2004.  The net

loss for the quarter was $3.4 million compared to a net loss of $6.5 million in the first quarter of 2005, and a net loss of $8.8 million in the second quarter of 2004.

54.    On July 28, 2005, FoxHollow's stock price soared about 18% to an all time high trading price of $55.20. The trading volume was almost 5 million shares, more than ten times ordinary volume, and the largest single trading day in the Company's history (other than its IPO).

55.    On July 29, 2005, FoxHollow filed with the SEC its Form 10-Q for the second quarter of 2005, signed by defendant Ferguson. FoxHollow reported its financial results for the second quarter, including record quarterly revenues.

56.    On October 26, 2005, FoxHollow filed with the SEC a Form 8-K, and issued a press release, announcing its financial results for the third quarter of fiscal year 2005 ended September 30, 2005. The Company reported revenue for the third quarter was $36.1 million, a 26% increase over revenue of $28.7 million in the second quarter of 2005 and a 212% increase over revenue of $11.6 million in the third quarter in 2004. The Company reported a gross margin of 73% versus 69% in the prior quarter and 40% in the third quarter of 2004. Net loss for the quarter was $1.5 million, compared to a net loss of $3.4 million in the second quarter of 2005 and a net loss of $7.4 million in the third quarter of 2004. Excluding stock-based compensation expenses, the FoxHollow actually reported net income for the first time. The Company also announced other significant accomplishments, including the agreement with Merck, promising treatment data presented at a trade meeting, the expansion of its manufacturing facility, and increased production capacity to meet future orders.

57.    On November 1, 2005, FoxHollow filed with the SEC its Form 10-Q for the third quarter of 2005, signed by defendant Ferguson. FoxHollow reported its financial results for the third quarter, including record quarterly revenues.

58.    On November 7, 2005, FoxHollow filed with the SEC its Form 8-K, and issued a press release, announcing a new lease for a 124,274 square foot facility. FoxHollow also announced that Myrtle Potter had been appointed to the FoxHollow Board. FoxHollow did not disclose that Potter had just purchased her new home in Woodside from Duke Rohlen, Simpson's son-in-law.

LAW OFFICES
COTCHETT,
PITRE, SIMON &
MCCARTHY

59.     During the Class Period, the representations made by defendants about FoxHollow, its business and operations, the performance of senior management, and its future expectations, were false and misleading.  As described below, they misrepresented and/or omitted the following adverse facts which then existed and disclosure of which was necessary to make the statements made not false and/or misleading.

60.     Specifically, at Simpson's direction, and with the Board's knowledge and concurrence, certain members of FoxHollow's senior management – including Thomas, Martin and Hoffman – had been ordered to complete the acquisition of Simpson's other private company, Lumend.  Simpson also threatened Thomas that, in the event he did not acquire Lumend, he would be terminated as CEO, notwithstanding his years of successful service to the Company and its shareholders.  Remarkably, while FoxHollow regularly reported that the loss of any of its senior management would negatively impact the Company and its share price, and that any acquisition, even one thought to be in the Company's best interests, could adversely impact the Company due to the costs and efforts imposed by the acquisition, defendants concealed both Simpson's edict and his threats of termination to the public, plaintiff and Class members.

61.     Senior management refused to go forward with the deal, since the acquisition made no business sense for FoxHollow, which already had a tested, market proven catheter product, and already had developed sales and marketing programs and trained employees based on its device's unique capabilities.  Conversely, Lumend's device was an inferior technology, untested and unproven in the market.  Lumend also did not have a fully capable infrastructure in place, and FoxHollow would have been forced to devote substantial resources to the untested device, even though it was premature and not commercially viable.  Moreover, the cost of acquiring Lumend was far above its market value, essentially constituting a gift to Simpson and affiliates who were investors in Lumend.  Indeed, there was no rational business reason for acquiring Lumend other than to pay off Simpson.

### D.   **FoxHollow Discloses The Management Purge And It Stock Plunges**

62.     After the close of trading on December 12, 2005, FoxHollow filed a Form 8-K with the SEC, and issued a press release entitled, "FoxHollow Technologies Announces Management Transition."  While Simpson had essentially forced Thomas to depart FoxHollow due to the Lumend deal, the press release reported that Thomas had "informed the Company's Board of Directors that he will be retiring" as President and CEO and resigning from the Board effective January 1, 2006 – i.e., just two weeks later.  FoxHollow also announced that Simpson would replace Thomas as "interim" CEO.  Simpson stated, "I have maintained a very active role with the Company and look forward to leading our outstanding group of senior management until we have named a replacement.  We will be looking for a permanent chief executive officer who has extensive leadership experience and who can lead the Company through its next stage of growth."  Even this brief statement was misleading, since Simpson did not intend on leading its present senior management nor view them as "outstanding."  To the contrary, Simpson planned to also fire Martin and Hoffman just a few weeks later.  FoxHollow also announced that a "management leadership committee" had been formed, comprised of Ferguson, Martin, Ron Steckel, and Duke Rohlen.

63.     The news took the market by complete surprise during a period in which FoxHollow had been reporting market and financial successes, record revenues, a first time profit, expanding facilities, and hiring new personnel.  On December 13, 2005, FoxHollow's share price plunged from the prior day's close of $46.12 to $38.97, a 15.5% drop.  The trading volume was massive, with over 4.5 million shares traded – the second largest trading day in the Company's history.  In the next few days, on continued large trading volume, FoxHollow's stock price fell to about $30 per share or a one-third loss of market capitalization.

64.     After the news, TheStreet.com reported that Herb Greenberg of Marketwatch "believes there is more to the story" and "raised a red flag over the sudden retirement announcement of FoxHollow CEO Robert Thomas.  Greenberg said Thomas is just 44 years old and 'loved the company.'" According to AP reports, Piper Jaffray analyst Thomas Gunderson stated in a research report, "There is a strong feeling of another shoe to drop in this story."

65.     On January 9, 2006, FoxHollow filed with the SEC its Form 8-K, and issued a press release, announcing its preliminary financial results for the fourth quarter ended December 31, 2005 and the full fiscal year 2005, as well as to give guidance for the first quarter and full fiscal year of 2006.  While the Form 8-K, signed by defendant Ferguson, indicated that previously forecasted revenue for the fourth quarter and the full year 2004 remained on course, there was no mention of the management "transition."  Instead, Simpson touted the results reached on Thomas' watch, stating "Our tremendous growth in 2005 and growth outlook for 2006 is based on our success in driving adoption for existing customers, as well as the significant increase of our customer base.  Revenues for 2005 more than tripled from 2004.  Our outlook for 2006 represents a more than 60 percent growth in year-over-year revenue."

66.     With respect to management of the Company, Simpson stated, "We have initiated a search for a new chief executive officer and have selected the firm of Spencer Stuart to assist us with that search.  While looking forward to the completion of the search process, *we are confident in the abilities of the senior management team already in place*."  Emphasis added.

67.     Yet, just two weeks later, just as the market activity in FoxHollow's stock started to stabilize from the sudden and unexpected departure of its CEO, a much different picture of senior management was revealed.  On January 26, 2006, FoxHollow filed with the SEC its Form 8-K, signed by defendant Ferguson, and issued a press release, announcing that David Martin was being replaced as Chief Operating Officer and William Hoffman was being replaced as Vice President of Sales.  Duke Rohlen, Simpson's son-in-law, was promoted to President of Strategic Operations and Ferguson remained as CFO.  Simpson explained, "Based on the new strategic initiatives we announced earlier this month, it is appropriate to effect this transition at this time."  On the news, FoxHollow's share price fell 7% the next trading day and about 15% within three days, reaching a new yearly low of $23.35.

68.     On January 26, 2006, analysts at Piper Jaffray released a report concerning FoxHollow entitled "Something Seems Amiss."  Therein, Piper Jaffray  analysts stated:

> We recently upgraded FOXH on valuation, after its 33% decline due to the uncertainty of 2006 revenues and the sudden resignation of the CEO.
> We are now inserting some caution on our short-term views. We have new

worries related to additional management shakeups, possibly the VP of Sales and/or the COO.  In our opinion, while neither would be a big loss fundamentally, we are left wondering why the news flow from FOXH is so uneven and what the underlying cause is for the potential management disruption.

We have been tracking down rumors (part of the job description these days) of management departures. We have not been able to confirm the rumors, but we are concerned by the lack of denial by management. In our opinion, true or not true, the rumors are gaining enough substance to engender comment from the company.

The uncertainty of "what's really wrong" can only be partially balanced by our channel checks that indicate a strong market for FOXH's products in 2006. We cannot assure investors that all is right inside the company; in our opinion, risk has increased.

But, with the stock declines of the last several days, and the possible confirmation of another round of management departure, we feel much of any rumored bad news is in the stock. We leave our long-term rating at Outperform-we have no evidence of a weaker market, while acknowledging that the short term will be bumpy. Investors should proceed with caution in the near term.

69.     Collectively, after public revelation of FoxHollow's management "transition," which was the end result of Simpson's undisclosed edict to Company management to acquire Lumend or else be terminated, plaintiffs and Class members lost *50%* of their stock value in just over one month.  The total market value loss is estimated at over ***$600 million***.

70.     Not surprisingly, FoxHollow's stock value has yet to recover from the revelation of this material information, and to this day is trading under $25 per share despite reportedly record revenues.

71.     FoxHollow recently announced that Simpson was changing his title from the "interim" CEO to the permanent CEO.   Simpson attributes the Company's sales success to its "strong management team" – i.e., his son-in-law, Duke, and his brother-in-law, defendant Ferguson.  On the news that Simpson was remaining as CEO, the stock dropped more than 10%.

## VI.     LOSS CAUSATION/ECONOMIC LOSS

72.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated FoxHollow's stock price and operated as a fraud and deceit on Class Period purchasers of FoxHollow common stock. Material information about Simpson's edict to Company management to acquire Lumend, and

his decision to terminate senior management if and when they refused to follow the edict, was concealed.  When the result of such edict, the sudden and unexpected departure of the three highest ranking members of management, was disclosed and became apparent to the market, the price of FoxHollow stock fell precipitously on massive trading volume as the prior artificial inflation came out of FoxHollow's stock price.  As a result of their purchases of FoxHollow common stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss, i.e., damages under the federal securities laws.

73.    An illustration of FoxHollow's share trading price, including periods immediately prior to and following the Class Period, readily confirms the causal impact of FoxHollow's revelation of the management turmoil and terminations in December 2005 and January 2006, following months of steady increases based on positive reports to the public markets:



1    **VII.    FRAUD-ON-THE-MARKET DOCTRINE**

2        74.    At all relevant times, the market for FoxHollow common stock was an efficient

3    market for the following reasons, among others: (1) the Company's common stock met the

4    requirements for public listing and was listed and actively traded on the Nasdaq National Market,

5    a highly efficient market, (2) as a regulated issuer, the Company filed periodic public reports with

6    the SEC, and (3) the Company regularly issued press releases which were carried by national

7    news wires.  Each of these releases was publicly available and entered the public marketplace.

8        75.    As a result, the market for FoxHollow's common stock promptly digested current

9    information with respect to the Company from all publicly available sources and reflected such

10   information in the price of the Company's common stock.  Under these circumstances, all

11   purchasers of the Company's common stock during the Class Period suffered similar injury

12   through their purchase of the common stock of FoxHollow at artificially inflated prices and a

13   presumption of reliance applies.

14   **VIII.   ADDITIONAL SCIENTER ALLEGATIONS**

15       76.    As alleged herein, defendants acted with scienter in that defendants knew that the

16   public documents and statements issued or disseminated in the name of the Company were

17   materially false and misleading; knew that such statements or documents would be issued or

18   disseminated to the investing public; and knowingly and substantially participated or acquiesced

19   in the issuance or dissemination of such statements or documents as primary violations of the

20   federal securities laws.  As set forth elsewhere herein, defendants, by virtue of their receipt of

21   information reflecting the true facts regarding FoxHollow, their control over, and/or receipt

22   and/or modification of FoxHollow's materially misleading misstatements and/or their

23   associations with the Company which made them privy to confidential proprietary information

24   concerning FoxHollow, participated in the fraudulent schemed alleged herein.

25       77.    Defendants knew and/or recklessly disregarded the falsity and misleading nature

26   of the information which they caused to be disseminated to the investing public.  The ongoing

27   fraudulent scheme described herein could not have been perpetrated over a substantial period of

28   time, as has occurred, without the knowledge and complicity of the Individual Defendants.

LAW OFFICES
COTCHETT,
PITRE, SIMON &
MCCARTHY

78.     Defendants had the motive and opportunity to perpetrate the fraudulent scheme and course of business described herein because the Individual Defendants were substantial shareholders in FoxHollow, and enjoyed substantial compensation benefits.  As senior officers and/or directors of FoxHollow, they issued statements and press releases on behalf of FoxHollow and had the opportunity to commit the fraud alleged herein.

## IX.   CAUSES OF ACTION

### First Cause of Action

### Violation of §10(b) of the 1934 Act and Rule 10b-5

79.     Plaintiffs hereby incorporate all of the foregoing paragraphs.

80.     During the Class Period, defendants disseminated or approved the false statements and/or concealments described above, which they knew or recklessly disregarded were materially false and misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.  Defendants employed a scheme to defraud and engaged in acts, practices and a course of business that operated as a fraud and deceit upon Plaintiffs and other Class members.

81.     The scheme, misrepresentations and concealments described herein affirmatively created an impression of a state of affairs that differed in a material way from the one that actually existed.

82.     Defendants, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to misrepresent and conceal adverse material information about FoxHollow and its own internal operations, as specified herein.

83.     As a result of the scheme, misrepresentations and failure to disclose material facts, as set forth above, the prices of the FoxHollow stock paid by Plaintiffs were distorted during the Class Period such that they did not reflect the risks and costs of the continuing course of conduct alleged herein.  In ignorance of these facts that prices of the stock were distorted by virtue of the concealed information identified herein, which withheld facts would have been material to a

1  reasonable investor similarly situated in making the decision to purchase the stock, plaintiff and

2  the other members of the Class acquired the stock during the Class Period at distorted prices and

3  were damaged.

4        84.    The fraudulent scheme, including the misrepresented and concealed information,

5  was the proximate cause of Plaintiffs' and the Class' investment losses since the very

6  circumstances that caused the loss represented by the decline in the FoxHollow stock price was

7  within the zone of risk misrepresented and/or concealed by defendants, such that the loss was

8  foreseeable and caused by the materialization of the misrepresented and/or concealed risk.  Thus,

9  there is a link between the subject of the misrepresentations and/or omissions and the loss such

10 that the subject was the cause.  The information misrepresented and/or concealed by defendants,

11 described herein, disguised the precise circumstances to which plaintiff and the Class fell victim.

12 Defendants concealed circumstances that foreseeably caused Plaintiffs' losses.

13       85.    At the time of said misrepresentations and/or omissions, Plaintiffs and other

14 members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs

15 and other members of the Class known of the truth, which was not disclosed by defendants,

16 Plaintiffs and other members of the Class would not have purchased or otherwise acquired the

17 stock.

18 **<u>Second Cause of Action</u>**

19 **<u>Violation of §20(a) of the 1934 Act</u>**

20       86.    Plaintiffs hereby incorporates all of the foregoing paragraphs.

21       87.    The Individual Defendants acted as a controlling person of FoxHollow within the

22 meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level

23 positions, and their ownership and contractual rights, participation in and/or awareness of the

24 Company's operations and/or intimate knowledge of the statements filed by the Company with

25 the SEC and disseminated to the investing public, the Individual Defendants had the power to

26 influence and control and did influence and control, directly and indirectly, the decision-making

27 of the Company, including the content and dissemination of the various statements which

28 plaintiff contends are false and misleading.  The Individual Defendants were provide with or had

1   unlimited access to copies of the Company's reports, press releases, public filings and other

2   statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were

3   issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

4          88.    The Individual Defendants had direct and supervisory involvement in the day-to-

5   day operations of the Company and, therefore, are presumed to have had the power to control or

6   influence the particular transactions giving rise to the securities violations as alleged herein, and

7   exercised the same.

8          89.    As set forth above, FoxHollow and the Individual Defendants each violated

9   Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this complaint.  By virtue

10  of their positions each as a controlling person, the Individual Defendants are liable pursuant to

11  Section 20(a) of the Exchange Act.  As a direct and proximate result of FoxHollow's and the

12  Individual Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered

13  damages in connection with their purchases of the Company's common stock during the Class

14  Period.

15  **X.    PRAYER FOR RELIEF**

16         WHEREFORE, Plaintiff, on behalf of themselves and the Class, pray for judgment as

17  follows:

18         1.     Declaring this action to be a proper class action pursuant to Rule 23 of the Federal

19  Rules of Civil Procedure on behalf of the Class defined herein, and declaring Plaintiffs to be a

20  proper Class representatives and Plaintiffs' counsel as counsel for the Class;

21         2.     Awarding Plaintiffs and all members of the Class compensatory damages and

22  exemplary damages in an amount to be proven at trial;

23         3.     Awarding Plaintiffs and members of the Class pre-judgment interest, as well as

24  reasonable attorneys' fees, expert witness fees and other costs;

25  / / /

26  / / /

27  / / /

28  / / /

1          4.        Awarding such other relief as this Court may deem just and proper.

2    Dated: December 15, 2006              COTCHETT, PITRE, SIMON & McCARTHY

3

4                                         By: _____/S/_____
                                                  MARK C. MOLUMPHY

5                                         JOSEPH W. COTCHETT (#36324)
                                          jcotchet@cpsmlaw.com
6                                         MARK C. MOLUMPHY (#168009)
                                          mmolumphy@cpsmlaw.com
7                                         KELLY L. SOMMERFELD (#234025)
                                          ksommerfeld@cpsmlaw.com
8                                         COTCHETT, PITRE, SIMON & McCARTHY
                                          840 Malcolm Road, Suite 200
9                                         Burlingame, CA 94010
                                          Telephone: (650) 697-6000
10                                        Fax: (650) 697-0577

11                                        *Co-Lead Counsel for Lead Plaintiffs and Class*

12                                        DAVID A.P. BROWER
                                          brower@browerpiven.com
13                                        ELIZABETH A. SCHMID
                                          schmid@browerpiven.com
14                                        BROWER PIVEN, A Professional Corporation
                                          488 Madison Avenue, 8th Floor
15                                        New York, NY 10022
                                          Telephone: (212) 501-9000
16                                        Fax: (212) 501-0300

17                                        *Co-Lead Counsel for Lead Plaintiffs and Class*

18                                        CHARLES PIVEN
                                          piven@browerpiven.com
19                                        BROWER PIVEN, A Professional Corporation
                                          401 East Pratt Street, Suite 2525
20                                        Baltimore, MD 21202
                                          Telephone: (410) 332-0030
21                                        Fax: (410) 685-1300

22                                        *Co-Lead Counsel for Lead Plaintiffs and Class*

23                                        SETH A SAFIER (#197427)
                                          seth@gutridesafier.com
24                                        MICHAEL R. REESE (# 206773)
                                          michael@gutridesafier.com
25                                        GUTRIDE SAFIER LLP
                                          835 Douglas Street
26                                        San Francisco, CA 94119
                                          Telephone: (415) 336-6545
27                                        Fax: (415) 876 - 4345

28                                        *Plaintiffs Liaison Counsel*

LAW OFFICES
COTCHETT,
PITRE, SIMON &
McCARTHY

## JURY DEMAND

Plaintiffs demand a jury trial on all issues so triable.

Dated: December 15, 2006          COTCHETT, PITRE, SIMON & McCARTHY

By: _____/S/_____
                    MARK C. MOLUMPHY

JOSEPH W. COTCHETT (#36324)
jcotchet@cpsmlaw.com
MARK C. MOLUMPHY (#168009)
mmolumphy@cpsmlaw.com
KELLY L. SOMMERFELD (#234025)
ksommerfeld@cpsmlaw.com
COTCHETT, PITRE, SIMON & McCARTHY
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Fax: (650) 697-0577

*Co-Lead Counsel for Lead Plaintiffs and Class*

DAVID A.P. BROWER
brower@browerpiven.com
ELIZABETH A. SCHMID
schmid@browerpiven.com
BROWER PIVEN, A Professional Corporation
488 Madison Avenue, 8th Floor
New York, NY 10022
Telephone: (212) 501-9000
Fax: (212) 501-0300

*Co-Lead Counsel for Lead Plaintiffs and Class*

CHARLES PIVEN
piven@browerpiven.com
BROWER PIVEN, A Professional Corporation
401 East Pratt Street, Suite 2525
Baltimore, MD 21202
Telephone: (410) 332-0030
Fax: (410) 685-1300

*Co-Lead Counsel for Lead Plaintiffs and Class*

SETH A SAFIER (#197427)
seth@gutridesafier.com
MICHAEL R. REESE (# 206773)
michael@gutridesafier.com
GUTRIDE SAFIER LLP
835 Douglas Street
San Francisco, CA 94119
Telephone: (415) 336-6545
Fax: (415) 876 - 4345

*Plaintiffs Liaison Counsel*

LAW OFFICES
COTCHETT,
PITRE, SIMON &
McCARTHY

CONSOLIDATED COMPLAINT

25

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    OVERVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.   JURISDICTION, VENUE AND SAFE HARBOR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

III.  THE PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

IV.  CLASS ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

V.   STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      A.    1996: Simpson Forms FoxHollow and Lumend . . . . . . . . . . . . . . . . . . . . . . . . 8

      B.    2004: Simpson Takes FoxHollow Public . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      C.    2005-2006: The False And Misleading Statements . . . . . . . . . . . . . . . . . . . . . 12

      D.    FoxHollow Discloses The Management Purge And It Stock Plunges . . . . . . . . . 16

VI.  LOSS CAUSATION/ECONOMIC LOSS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

VII. FRAUD-ON-THE-MARKET DOCTRINE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

VIII. ADDITIONAL SCIENTER ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

IX.  CAUSES OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

     First Cause of Action
     Violation of §10(b) of the 1934 Act and Rule 10b-5 . . . . . . . . . . . . . . . . . . . . . . . . . 21

     Second Cause of Action
     Violation of §20(a) of the 1934 Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

X.   PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

LAW OFFICES
COTCHETT,
PITRE, SIMON &
MCCARTHY