JOSEPH W. COTCHETT (#36324)
jcotchet@cpmlegal.com
MARK C. MOLUMPHY (#168009)
mmolumphy@cpmlegal.com
LAURA SCHLICHTMANN (#169699)
lschlichtmann@cpmlegal.com
SEAN E. PONIST (#204712)
sponist@cpmlegal.com
COTCHETT, PITRE & McCARTHY
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Fax: (650) 697-0577

*Co-Lead Counsel for Lead Plaintiffs and Class*

DAVID A.P. BROWER
brower@browerpiven.com
BROWER PIVEN
A Professional Corporation
488 Madison Avenue, 8th Floor
New York, NY 10022
Telephone: (212) 501-9000
Fax: (212) 501-0300

*Co-Lead Counsel for Lead Plaintiffs and Class*

CHARLES J. PIVEN
piven@browerpiven.com
BROWER PIVEN
A Professional Corporation
401 East Pratt Street, Suite 2525
Baltimore, MD 21202
Telephone: (410) 332-0030
Fax: (410) 685-1300

*Co-Lead Counsel for Lead Plaintiffs and Class*

SETH A SAFIER (#197427)
seth@gutridesafier.com
MICHAEL R. REESE (# 206773)
michael@gutridesafier.com
GUTRIDE SAFIER LLP
835 Douglas Street
San Francisco, CA 94119
Telephone: (415) 336-6545
Fax: (415) 876 - 4345

*Plaintiffs Liaison Counsel*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| IN RE FOXHOLLOW TECHNOLOGIES, INC. SECURITIES LITIGATION | ) Master File No. 06-4595-PJH<br>)<br>) **FIRST AMENDED COMPLAINT FOR**<br>) **VIOLATIONS OF FEDERAL**<br>) **SECURITIES LAWS**<br>)<br>) JURY TRIAL DEMANDED |

FIRST AMENDED COMPLAINT

1

TABLE OF CONTENTS

Page

2

3

I.  OVERVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  JURISDICTION, VENUE AND SAFE HARBOR . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III.  THE PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

IV.  CLASS ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

V.  STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    A.  1996: Formation of FoxHollow and Lumend . . . . . . . . . . . . . . . . . . . . . . . 9

    B.  2004: FoxHollow Goes Public . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    C.  Between Its October 2004 IPO and August 2005, FoxHollow Used SEC Filings
    and Earnings Calls to Inform The Public About Its Expanding Revenues and
    Vigorous Efforts to Secure The Long-Term Employment of the Executive
    Officers Responsible for the Company's Expansion . . . . . . . . . . . . . . . . . . . . . . . . . 11

    D.  In August 2005, In Stark Contract To the Perceived State of Affairs At
    FoxHollow, The Company In the Midest of Internal Turmoil Caused By
    Simpson's Sudden Edict to Senior Management To Use Company Funds To
    Acquire Lumend Company or Else Resign . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        1.  Simpson's August 28, 2005 Threat To Executive Staff . . . . . . . . . . . . . 18

        2.  The December 12, 2005 Announcement of Thomas' "Resignation: And
        Reassurance About The Status Of The Remaining Management Team . 20

VI.  LOSS CAUSATION/ECONOMIC LOSS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

VII.  FRAUD-ON-THE-MARKET DOCTRINE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

VIII.  ADDITIONAL SCIENTER ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

IX.  CAUSES OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    First Cause Of Action-Violation of §10(b) fo the 1934 Act and Rule 10b-5 . . . . . . . 29

    Second Cause Of Action-Violation of §20(a) of The 1934 Act . . . . . . . . . . . . . . . . 30

X.  PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Plaintiff alleges as follows upon information and belief based upon, *inter alia*, the investigation conducted by plaintiff's counsel, except as to those allegations pertaining to plaintiff personally, which are alleged upon knowledge.  The investigation of his counsel included, among other things, a review of FoxHollow Technologies, Inc.'s ("FoxHollow" or the "Company") financial condition, documents pertaining to FoxHollow and Lumend, as well as regulatory filings, reports, analyst conference call transcripts, press releases and media reports about FoxHollow.

The investigation further included interviews with three confidential witnesses who were executive employees of FoxHollow during the relevant period, with direct knowledge of FoxHollow's operations, the Company's consideration of Lumend, Board conversations with executive staff members about Lumend and Robert Thomas, and executive management termination decisions and disclosures ("Executive Employee Witnesses 1, 2 and 3").

Plaintiff believes that substantial evidence exists for the allegations set forth in this Complaint.

I.    **OVERVIEW**

1.    Plaintiff brings this action on behalf of a Class of all persons and entities who purchased or sold FoxHollow common stock from August 28, 2005 through January 26, 2006 ("Class Period") and suffered damages ("Class").

2.    FoxHollow was founded by defendant John Simpson in 1996.  It is based in Redwood City, California.  FoxHollow's sole product is a medical device called the SilverHawk, used to treat peripheral artery disease or PAD.  The catheter device is like a Roto-Rooter.  It is inserted inside a clogged artery, and a spinning blade within the catheter is switched on to cut through and remove plaque.

3.    In 1996, at the same time Simpson formed FoxHollow, he formed another company called Lumend, Inc.  Lumend is also based in Redwood City.  It has one primary product, called the Frontrunner, which is a catheter device inserted into an artery to penetrate plaque blockages and treat PAD.  However, unlike FoxHollow's device, Lumend's device does not remove the plaque, but merely creates an opening for other treatments to then be used.

4.       Simpson, who had successfully formed other medical device companies and sold them for millions of dollars, spent several years trying to gauge the respective businesses of FoxHollow and Lumend, with contrasting results.  Ultimately, given the superiority of the FoxHollow technology and market interest, Simpson decided to only take FoxHollow public.

5.       In October 2004, FoxHollow commenced an initial public offering at $14 per share.  Overnight, Simpson's founders' stock – like that of his friends, family and medical colleagues who also invested pre-IPO – was worth millions.

6.       Over the next year, as FoxHollow reported record revenues on a quarterly basis, its stock price more than tripled in value, surpassing $50 per share by July 2005.  In virtually every SEC filing, press release, and earnings conference call during this period, FoxHollow's management publicly lauded the role of its senior officers in the Company's continuing success.

7.       Notably, in its SEC filings, FoxHollow also highlighted its efforts to retain senior officers by structuring  their compensation packages to ensure their **long-term** employment.  For example, in its proxy statement filed with the SEC on May 16, 2005, FoxHollow reported that its Compensation Committee had approved a unique "bonus" and "additional bonus" plan **solely applicable** to its three highest ranking officers, including Robert Thomas, its Chief Executive Officer, and David Martin, its Chief Operation Officer, whereby they would be entitled to lucrative "long term compensation awards" of stock options with extended vesting requirements in the event financial goals were met.  By virtue of these special plans, Thomas and Martin alone received about 600,000 stock options, representing 30% of the total options granted to all employees.  These options had ten-year terms.  In addition, while employment at FoxHollow was generally at will, the proxy noted these executive officers had special agreements under which the vesting of options accelerated upon a change of control.

8.       By virtue of these SEC filings, press releases, and earnings calls, the public market and analysts were uniformly led to believe a certain "state of affairs" at FoxHollow, i.e., that the Company and its Board were entirely satisfied with its executive team, including Thomas, and highly motivated to retain them for long-term employment.  However, it turns out that such a public perception – shared by every analyst covering FoxHollow – was mistaken.

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

FIRST AMENDED COMPLAINT

2

9.     In November 2004, FoxHollow's management was asked by Simpson to consider acquiring his other company, Lumend.  Over the next several months, between November 2004 and August 2005, FoxHollow's management conducted extensive due diligence and evaluation of Lumend, including detailed sales and revenue forecasts.  As a result of such due diligence, three of FoxHollow's six executive officers – including Martin (COO), Hoffman (VP Sales) and Leslie Trigg (VP Marketing) – informed Simpson and Thomas that an acquisition made no sense to FoxHollow, involved inferior technology, and would only get in the way of its already successful business model.  Indeed, the only two executive officers that were in favor of acquiring Lumend were personally related to Simpson – Duke Rohlen, Simpson's son-in-law, and Matt Ferguson, Rohlen's brother-in-law.

10.     At first, Simpson and Thomas attempted to coerce Martin, Hoffman and Trigg to change their minds.  For example, Thomas separately promised both Martin and Hoffman that, if they signed on to a Lumend acquisition, they would be given the opportunity to run Lumend. Both rejected the unethical offer.  Eventually, Simpson grew tired and increasingly irritated at the executive team's refusal to purchase Lumend, as well as with Thomas' seeming inability to "control" Martin, Hoffman and Trigg and to obtain their consent.

11.     On or about August 28, 2005, Simpson told Thomas that the Lumend acquisition would go forward, with or without all of the executive officers' consent, that his decision had already been approved by the Board, that it was final and non-negotiable, and that executive team members would be asked to resign if they refused to go along with the Lumend acquisition. Simpson ordered that the transaction be closed by the end of the week.  This material information was concealed from the public.

12.     Martin, Hoffman and Trigg refused to bow to Simpson's pressure and told Thomas that they would not sign off on the Lumend transaction.  Simpson was forced to sell Lumend to another party.  Simpson then carried out his threat and purged FoxHollow of its "disloyal" management.

13.     On Monday, December 12, 2005, in the midst of record sales and revenues, the Company's first ever profit, and a stock value driven by a public perception of management

harmony and success, FoxHollow suddenly announced that its Board had decided to make a "change" in management and replace Thomas, the Company's President and CEO.  Rather than reveal that Thomas had been forced to resign from FoxHollow due to, among other things, his inability to coerce other officers to approve the Lumend transaction, Simpson and Thomas then held a conference call with miffed analysts and represented that Thomas was "retiring" for "personal reasons."  In fact, Thomas had been forced to resign, i.e., fired, just days earlier, after the Board had met with executive officers and interrogated them about Thomas and his role with Lumend.

14.     The explanation made little sense to analysts who had closely covered FoxHollow since its IPO in 2004.  The Company had given no prior notice of Thomas' intention to leave FoxHollow voluntarily or for personal reasons, and to the contrary, actively promoted the fact that Thomas was leading the Company through quarter after quarter of record profits, with lucrative stock options waiting to be exercised for remaining at the Company.  Nonetheless, anticipating analyst concerns about other management changes, both Simpson and Thomas reassured analysts about the Company's confidence in the remaining members of management and their expected longevity.  Simpson stated that FoxHollow expected a smooth CEO transition "based on our success and strong management team we have in place."  Commenting on Thomas' departure, Simpson stated, "He leaves us in very good shape with a strong management team."

15.     Following the conference call, FoxHollow's share price fell from $46.12 to $38.97 the next trading day on ten times ordinary volume.  Within one week, FoxHollow was trading below $31 per share, a loss of *one-third* of its market capitalization or over ***$375 million***.  This substantial drop was only tempered by Simpson's assurances that Thomas' departure was routine and that the Company had complete confidence in the existing management team, including Martin and Hoffman.

16.     However, the other shoe dropped without warning on January 25, 2006.  Contrary to prior assurances, FoxHollow announced that Martin, the COO, and Hoffman, the VP of Sales, were also going to be replaced.  FoxHollow reported that Duke Rohlen, Simpson's son-in-law,

1  who had no prior public management experience, had been promoted to President of Strategic

2  Operations and Matt Ferguson, Rohlen's brother-in-law, was remaining as CFO.  Over the next

3  three days, FoxHollow's share price fell from $27.34 to a low of $23.35, another 15% loss.

4  17.  Together, after disclosure of the management changes, FoxHollow shareholders

5  lost *50%* of their stock value in just over one month.  The total market value loss is estimated at

6  over ***$600 million***.  By this action, plaintiff seeks to recover damages for this conduct in violation

7  of federal securities laws.  Given their prior disclosures, FoxHollow had a duty to disclose

8  material information about Simpson's decision, approved by the Board, to acquire Lumend and

9  to terminate any executives who refused to go along with that decision.  This decision was

10  reached on August 28, 2005.  Moreover, on December 12, 2005, once defendants chose to speak

11  about the reason for Thomas' sudden departure, and their expectation that other executive

12  officers would remain at FoxHollow, they had a duty to accurately represent all material facts.

13  They did not.

14  **II.   JURISDICTION, VENUE AND SAFE HARBOR**

15  18.  Plaintiff brings this action pursuant to Sections 10(b) and 20(a) of the Securities

16  Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.  This Court has jurisdiction over

17  this action pursuant to §27 of the 1934 Act (15 U.S.C. §78aa).

18  19.  Venue is proper in this district.  Defendant FoxHollow resides and conducts

19  business in this District.  A substantial part of the events, acts, omissions and transactions

20  complained of herein, including the concealment and misrepresentation of information to

21  plaintiffs and the Class, occurred in this District.  At all relevant times herein, defendant

22  conducted substantial business and/or committed violations of United States law by acts

23  committed in this District.

24  20.  The statutory safe harbor provided for forward-looking statements under certain

25  circumstances does not apply to the defendants' material misrepresentations and omissions

26  alleged in this Complaint.  Defendants' misrepresentations and omissions were not identified as

27  forward-looking statements, they were not accompanied by meaningful cautionary statements

28  identifying important factors which could cause actual results to differ materially from those in

forward-looking statements, or they were not forward-looking statements within the meaning of the statute.  Alternatively, to the extent any omissions or statements pleaded herein are considered to be "forward-looking," defendants are liable because at the time each was made, the speaker knew that the statement was false and the statement was authorized and/or approved for issuance by the defendant who knew that those statements were false when made.

III.    **THE PARTIES**

21.    Lead Plaintiff Matthew Roberts purchased Foxhollow common stock during the Class Period and was damaged thereby.

22.    Defendant FoxHollow Technologies, Inc. is a corporation organized under the laws of Delaware, with principal executive offices at 740 Bay Road, Redwood City, California.

23.    Defendant John B. Simpson is the CEO and a director of FoxHollow.  Simpson founded FoxHollow in September 1996 and has served as a member of its Board of Directors from September 1996 to the present.  From October 1996 to July 1997, Simpson served as President of FoxHollow.  From May 2004 to December 2005, Simpson served as a paid consultant to FoxHollow.  From January 2005 to June 5, 2006, Simpson served as the Interim CEO and then became the permanent CEO.  Simpson, along with his family members and related trusts, companies, and venture capital funds, is also a large and controlling shareholder of FoxHollow and sold thousands of shares during the Class Period.  Simpson's son-in-law is Duke Rohlen, the President of Strategic Relations.  Rohlen's brother-in-law is Matthew B. Ferguson, the CFO.

24.    Simpson possessed the power and authority to control the contents of FoxHollow's quarterly and annual reports and other SEC filings, press releases, presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  He was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of his positions and access to material non-public information available to him but not to the public, he knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive

representations which were being made were then materially false and misleading.  Simpson is liable for the concealments and false statements pleaded herein.

25.    Plaintiff is ignorant of the true names of defendants sued as Does 1 through 10, inclusive, and therefore sues these defendants by such fictitious names and will seek leave of the Court to amend this Complaint to allege their true names and capacities when they are ascertained.  Plaintiff alleges that each of the Doe Defendants is responsible for the acts alleged in this Complaint and that Plaintiff's damages were caused by the Doe Defendants.

26.    Defendants, and the Doe Defendants, and each of them, are individually sued as participants and as aiders and abettors in the improper acts, plans, schemes, and transactions, to induce Plaintiff and the class to purchase the debt securities that are the subject of this Complaint.

27.    Various other people, firms, and corporations, presently unknown to Plaintiff and sued herein as Does 1 through 10 in this Complaint, have participated as members of the alleged scheme or acted in furtherance of it, or aided or assisted in carrying out its purposes as alleged in this Complaint, and have performed acts and made statements in furtherance of the violations and conspiracy.

28.    At all relevant times, each Defendant was and is the agent of each of the remaining Doe Defendants, and in doing the acts alleged herein, was acting within the course and scope of such agency.  Each Defendant ratified and/or authorized the wrongful acts of each of the other Doe Defendants.

## IV.    CLASS ALLEGATIONS

29.    Plaintiffs bring this action as a class action under Federal Rule of Civil Procedure, Rule 23.  The Class is defined as all persons and entities who purchased or sold FoxHollow common stock from August 28, 2005 through January 26, 2006 and suffered damages.  Excluded from the class are the defendants herein, and the subsidiaries, parents, affiliates, family members and/or controlled persons or entities of each defendant.

30.    The members of the class are so numerous that joinder of all members is impracticable.  While the exact number of class members is unknown to Plaintiff at the present

LAW OFFICES
COTCHETT,
PITRE &
McCARTHY

time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of members located throughout the United States.  Throughout the Class Period, FoxHollow had approximately 25 million shares of common stock outstanding, which were actively traded on the Nasdaq National Market in an efficient market.

31.     Plaintiff's claims are typical of the claims of the members of the class, as Plaintiff was victimized by the same scheme and induced to purchase the common stock based upon the same misrepresentations and omissions, and was damaged thereby.

32.     Plaintiff will fairly and adequately protect the interests of the members of the class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests which are contrary to or in conflict with those of the class members he seeks to represent.

33.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the class members to individually seek redress for the wrongs done to them.  Plaintiff knows of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

34.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Common questions of law and fact exist as to all members of the class and predominate over any questions affecting solely individual members of the class.  Among questions of law and fact common to the class are:

        a.     whether the federal securities laws were violated by defendants' acts and omissions as alleged herein;

        b.     whether defendants misstated and/or failed to disclose material facts in their public statements and filings;

        d.     whether defendants participated directly or indirectly in the course of conduct alleged and whether they acted with scienter;

        e.     whether class members were damaged and the proper measure of damages.

LAW OFFICES
COTCHETT,
PITRE &
McCARTHY

FIRST AMENDED COMPLAINT

8

# V.       STATEMENT OF FACTS

## A.       1996:  Formation of FoxHollow and Lumend

35.       In 1996, Simpson formed FoxHollow to market a device used to treat peripheral artery disease or PAD.  The device is called the SilverHawk and collects and removes plaque in order to reopen narrowed or blocked arteries.

36.       Similarly, in 1996, at the same time he was forming FoxHollow, Simpson formed another private company called Lumend, along with Matthew Selmon.  For years, Selmon has been Simpson's medical partner at a private cardiology practice in Redwood City, near Sequoia Hospital.

37.       Similar to FoxHollow, Lumend's primary product was called the Frontrunner, which is a catheter used by physicians to penetrate and "cross" an occlusion or blockage in the artery.   Unlike the SilverHawk, the Frontrunner simply crosses the blockage so that other treatments, such as angioplasty or stents, can be used to treat the problem.  The Frontrunner does not actually remove the plaque.

38.       Lumend has other similarities with FoxHollow.  Before its IPO, FoxHollow was financially backed by Simpson, through his affiliated venture capital firm called De Novo Ventures.  De Novo, which is based in Menlo Park, also was one of the primary investors in Lumend.  De Nova was co-founded in 2000 by Simpson and Richard Ferrari.  Ferrari also served on FoxHollow's Board of Directors until 2005.

39.       Simpson used De Novo Ventures to fund several different companies including Guidant, Perclose and Prolithics.   Each of these companies were working to develop technology in the biotechnology and medical device industries and, at times, operated under the same roof.  For example, Lumend and Fox Hollow initially operated out of the same office building, located at 167 Constitution Drive, Menlo Park, California with employees of both companies literally working side by side.

40.       Tomoaki Hinohara, who also practices with Simpson and Selmon in Redwood City, helped to invent and develop the Lumend technology and is listed as a co-inventor on several patents issued to or patent applications made by Lumend.  Hinohara is also an

1   interventional cardiologist at Stanford University, where Simpson works as a Professor of

2   Clinical Medicine.  Both Simpson and Hinohara previously served on the Board of Perclose Inc..

3   Hinohara serves as a director at FoxHollow and a member of its Compensation Committee.

4        41.     Douglas S. Rohlen or "Duke" Rohlen is Simpson's son-in-law and the brother-in-

5   law of defendant Ferguson, Fox Hollow's CFO.   Neither Rohlen nor Ferguson had served as an

6   officer or director of a public company.  Before joining FoxHollow, Rohlen worked as the

7   Director of Business Development at Lumend for his father-in-law.

8        42.     Unlike FoxHollow's Silverhawk technology, Lumend was a market failure and

9   failed to make significant inroads into the PAD treatment market.  Its Frontrunner device was

10  also inferior to other treatment alternatives available to physicians, including the SilverHawk.

11       43.     Accordingly, after receiving clearance from the FDA to market the SilverHawk,

12  Simpson devoted his efforts to FoxHollow's business.  Between 2003 and 2004, Simpson

13  directed management to build a direct sales force organization and initiate sales to medical

14  centers.  With the efforts of Robert Thomas, CEO, David Martin, COO, and William Hoffman,

15  Vice President of Sales, FoxHollow then introduced its product to the United States, with

16  significant success.  By September 2004, Fox Hollow had 217 employees and had just completed

17  a move into a 61,000 square foot facility in Redwood City.

18       **B.     2004:  FoxHollow Goes Public**

19       44.     In September 2004, FoxHollow commenced filings with the SEC to take the

20  Company public.

21       45.     At the time, the Company's executive officers included five members: Thomas,

22  CEO, Ferguson, CFO, Martin, COO, Hoffman, Vice President of Sales, and Leslie Trigg, Vice

23  President of Marketing.  The Company's Board included Simpson, Hinohara, Ferrari, Thomas,

24  Ryan Drant and Sanford Fitch.  In addition, in May 2004, FoxHollow and Simpson entered into a

25  consulting agreement whereby Simpson was paid $25,000 per month to provide consulting

26  services.  Simpson maintained a physical office at FoxHollow.

27       46.     On October 28, 2004, FoxHollow filed its Registration Statement and Prospectus

28  to initiate its initial public offering.  FoxHollow offered 4.5 million shares of its common stock at

an initial price of $14.00 per share.  At the time, according to the Prospectus, De Novo held 2,075,173 shares and 32,451 options and warrants, representing 12% of the Company before the IPO and 9.5% after the IPO.  Simpson held 7,814,693 shares and 117,061 options and warrants, representing 44.8% before the IPO and 35.7% after the IPO.

**C.     Between Its October 2004 IPO And August 2005, FoxHollow Used SEC Filings And Earnings Calls To Inform The Public About Its Expanding Revenues And Vigorous Efforts To Secure The Long-Term Employment Of The Executive Officers Responsible For The Company's Expansion**

47.     On December 6, 2004, FoxHollow filed with the SEC its Form 10-Q for the third quarter ending September 30, 2004.  The 10-Q was signed by Thomas and Ferguson.  The Company announced that net revenues were $11.6 million for the first three months ended September 30, 2004, compared to $650,000 for the three months ended September 30, 2003.  The Company announced that net revenues were $23.9 million for the nine months ended September 30, 2004, compared to $876,000 for the nine months ended September 30, 2003.  The Company disclosed that its IPO completed on October 28, 2004 had sold 4.5 million shares at $14.00 per share, and on October 29, 2004, the underwriters had exercised their over-allotment option to purchase 675,000 shares at $14.00 per share.  Proceeds from the offering were about $67.4 million.

48.     On February 14, 2005, FoxHollow filed with the SEC its Form 8-K, signed by Thomas, and issued a related press release, announcing its fourth quarter 2004 and year end results.  The Company announced that its fourth quarter revenues were $14.7 million, a 27% increase over the $11.6 million reported for third quarter of 2003.  For the full year, FoxHollow reported net revenues of $38.6 million, compared to $2.6 million for 2003.

49.     On March 28, 2005, FoxHollow filed with the SEC its Form 10-K.  The 10-K, signed by Thomas and Simpson, reiterated the fourth quarter 2004 and year end results announced on February 14.  With respect to its employees, FoxHollow announced that it had increased its staff to 244 employees noting that "We believe that our future success will depend

on our continued ability to attract, hire and retain qualified personnel" and that "we believe our employee relations are good."

50.     On April 27, 2005, Fox Hollow filed with the SEC its Form 8-K, signed by Thomas, and issued a related press release, announcing its financial results for the first quarter of 2005 ended March 31, 2005.  The Company announced that its revenue was $21.5 million, which was a 46% increase over revenue of $14.7 million in the fourth quarter of 2004 and a 350% increase over first quarter 2004 revenue of $4.8 million.  The Company reported a gross margin of 59% for the first quarter of 2005 versus 52% in the fourth quarter of 2004 and 14% in the first quarter of 2004.  Net loss for the quarter was $6.5 million, compared with a net loss of $7.5 million in the fourth quarter of 2004.  Thomas also noted that FoxHollow ended the quarter with 89 direct salespeople, compared with 69 in the fourth quarter of 2004, and was on track to have about 125 sales professionals by the end of 2005.

51.     On April 27, 2005, FoxHollow also held an Earnings Conference Call for analysts.  Thomas, Rohlen and Ferguson participated on the call for FoxHollow.  Analysts participants included Mike Weinstein from J.P. Morgan, Jason Mills from First Albany, Tom Gunderson from Piper Jaffray, and Lynn Pieper from Thomas Weisel Partners.  After reporting extensively on FoxHollow's success during the first quarter, Thomas concluded:

> "We are executing on our plan by growing our sales force, increasing capacity and implementing effective marketing and sales programs.  At the same time, we are running the company to ensure that we achieve managed growth and drive the company towards profitability.  As a result, we believe our story will only get better in the months and years ahead.  The challenge we face is not one of creating a market, but rather executing on the opportunities in front of us.  We believe we have the resources, technology, people and financial to realize our goals not only with our core business but in other exciting areas as well."

Emphasizing this point, Thomas stated that FoxHollow has a "team that is executing on every level imaginable."  Responding to a question from Gunderson of Piper Jaffray, Ferguson noted that the Company expected to turn its first profit during the fourth quarter of 2005.

52.     On May 13, 2005, FoxHollow filed with the SEC its Form 10-Q for the first quarter of 2005, signed by Ferguson and Thomas.  FoxHollow reported record quarterly

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

revenues.  Notably, within the litany of "Factors Affecting Future Operating Results" listed by

FoxHollow in its 10-Q, and repeated in all future 10-Qs filed with the SEC, were the following:

> **We depend on skilled and experienced personnel to operate our business effectively.  If we are unable to recruit, hire and retain these employees, our ability to manage and expand our business will be harmed, which would impair our future revenue and profitability.**
>
> *Our success largely depends on the skills, experience and efforts of our officers and other key employees.  Any of our officers and other key employees may terminate their employment at any time.  The loss of any of our senior management team could harm our business.*  Our ability to retain our skilled labor force and our success in attracting and hiring new skilled employees will be a critical factor in determining whether we will be successful in the future.  We may not be able to meet our future hiring needs or retain existing personnel.  We will face particularly significant challenges and risks in hiring, training, managing and retaining engineering and sales and marketing employees.  Failure to attract and retain personnel, particularly technical and sales and marketing personnel, would harm our ability to compete effectively and grown our business. *The announcement of the loss of one of our key employees could negatively affect our stock price.*"

The Company also stated:

> "**If we make acquisitions or divestitures, we could encounter difficulties that harm our business.**
>
> We may acquire companies, products or technologies that *we believe to be complementary to the present or future direction of our business*.  If we engage in such acquisitions, we may have difficulty integrating the acquired personnel, financials, operations, products or technologies. *Acquisitions may dilute our earnings per share, disrupt our ongoing business, distract our management and employees and increase our expenses, which could harm our business.*  If we use our common stock to acquire companies, products or technologies, it may substantially dilute the percentage of the company held by stockholders who own securities prior to the acquisition.*"

Emphasis in bold in original; emphasis in italics added.

53.     On May 16, 2005, FoxHollow filed with the SEC its Schedule 14A Proxy

Statement ("Proxy").  The Proxy, signed by Thomas, provided the most detailed description yet

of FoxHollow's compensation packages for executive officers.  The Proxy also described in

detail the efforts of FoxHollow's Compensation Committee to ensure the long-term retention of

certain officers, including Thomas, Martin and Hoffman.  At the time the Proxy was filed,

FoxHollow had six directors, including Simpson, Thomas, Richard Ferrari (Simpson's business

partner with De Novo Ventures), and Tomoaki Hinohara (Simpson's medical partner).  The

Compensation Committee consisted of Ryan Drant, Ferrari and Hinohara.

54.     In the Proxy, the Compensation Committee issued a Report detailing the compensation program for executive officers and its "overall executive compensation philosophy" to "attract and retain executives who are critical to Fox-Hollow's long-term success."  According to the Report, the major components of the strategy were (1) base salary, (2) cash bonuses, and (3) "potential long-term compensation through stock options."  With respect to cash bonuses, the Compensation Committee stated that it had met and approved a special "Bonus Plan" for solely applicable to three officers: the CEO, COO and CFO.  This Bonus Plan provided additional cash based on revenue and performance goals.  In addition, the Compensation Committee approved an "Additional Bonus" to the same three officers, in the event the revenue and performance goals were exceeded.  Finally, under the heading, "Long-Term Incentives," the Compensation Committee stated it would award stock options to officers "both as a reward for past individual and corporate performance *and as an incentive for future performance*," viewing stock options as "*long-term compensation*" designed to ensure the long-term employment of its management.  All options granted under this program to officers were ten-year terms, with delayed vesting.

55.     The Proxy also set forth a Summary Compensation Table for executive officers, including Thomas, Martin and Hoffman.  The Table reflected that all three had received salary raises from the prior year.  All three officers also received substantial cash bonuses, including a $78,000 bonus to Hoffman, ad $265,000 bonus to Martin, and a $250,000 bonus to Thomas.

56.     With respect to FoxHollow's reported efforts to retain these three highest ranking officers, the Table further noted that all three had received substantial "Long Term Compensation Awards" consisting of stock option grants.  Specifically, Hoffman was granted a long term award of 129,548 options, Martin received a grant of 257,987 options, and Thomas received a grant of 499,571 options (in addition to 425,000 option grants from the prior year).  These three grants alone represented over 30% of the total options granted to all employees during the fiscal year.  The grants carried a low exercise price of just $0.32 per share and a *ten-year term*.  The Proxy's description of the grants and the terms themselves were a clear indicator to the public market that Fox Hollow wanted to retain Thomas, Martin and Hoffman for a long term, and to provide all

three with powerful financial incentives to remain at FoxHollow.  Indeed, the reported value of unvested options held by Thomas, Martin and Hoffman was over ***$29 million***.

57.    On May 18, 2005, shortly after the release of the Proxy, Thomas was presented with the industry's top award – the Platinum ABBY – at the Seventh Annual Innovations in Healthcare event and awards ceremony in Orange, California.  The award was presented by the Adaptive Business Leaders Organization, comprised of CEOs and Presidents of healthcare and technology firms in the United States.  A news release of the award, published on PRNewswire on May 19, 2005, stated that Thomas was recognized for his work at FoxHollow, which had generated over $40 million in revenues over the past 12 months.

58.    During the ten-day trading period between May 16, 2005 and May 26, 2005, FoxHollow's share price climbed from about $30 per share to $40 per share on heavy volume.

59.    On June 20, 2005, FoxHollow filed with the SEC a Form 8-K, signed by Thomas, and issued a press release announcing that Jeffrey Child had been added to FoxHollow's Board of Directors, filling a vacancy created by Richard Ferrari, who resigned on June 17, 2005.  Child was a close friend and a neighbor of Ferguson.

60.    On July 27, 2005, FoxHollow filed with the SEC a Form 8-K, signed by Thomas, and issued a press release announcing its financial results for the second quarter of fiscal year 2005 ended June 30, 2005, including revenue for the quarter of $28.7 million, a 33% increase over revenues of $21.5 million in the first quarter of 2005, and a 283% increase over revenues of $7.5 million in the second quarter of 2004.  The Company also reported a gross margin of 69% in the second quarter, versus 59% in the first quarter of 2005 and 19% in the second quarter of 2004.  The net loss for the quarter was $3.4 million compared to a net loss of $6.5 million in the first quarter of 2005, and a net loss of $8.8 million in the second quarter of 2004.

61.    On the same day, July 27, 2005, FoxHollow held an Earnings Conference Call for analysts.  Thomas, Rohlen and Ferguson participated on the call for FoxHollow.  Analysts participants included Mike Weinstein from J.P. Morgan, Jason Mills from First Albany, Tom Gunderson from Piper Jaffray, and Ben Andrew from William Blair.  After reporting extensively on FoxHollow's successes, Thomas stated:

"An important piece of the FoxHollow infrastructure story is our people.  We are continuing to add to our bench strength with the addition of management personnel in all areas of the Company.  I want to take this opportunity to acknowledge the tremendous efforts of all of our employees throughout the organization, including operations, R&D, sales, marketing, IT, the critical and regulatory department, and our finance and administrative groups."

62.     On July 28, 2005, FoxHollow's stock price soared about 18% to an all time high trading price of $55.20.  The trading volume was almost 5 million shares, more than ten times ordinary volume, and the largest single trading day in the Company's history (other than its IPO).

63.     On July 29, 2005, FoxHollow filed with the SEC its Form 10-Q for the second quarter of 2005, signed by defendant Ferguson.  FoxHollow reported its financial results for the second quarter, including record quarterly revenues.

**D.      In August 2005, In Stark Contrast To The Perceived State Of Affairs At FoxHollow, The Company In The Midst Of Internal Turmoil Caused By Simpson's Sudden Edict To Senior Management To Use Company Funds To Acquire Lumend Company Or Else Resign**

64.     By virtue of the statements described in Paragraphs 48 to 63 above, the public market and industry analysts were uniformly led to believe that FoxHollow's Board was entirely satisfied with the performance of its executive team, including Thomas, who, at just over 40 years of age, was leading one of the fastest-growing medical device corporations in United States history, with a lucrative stock-based compensation package to ensure his long-term, continued employment.  Beginning in August 2005, that public perception was mistaken.

65.     Back in November 2004, FoxHollow's management had been asked by Simpson to consider acquiring his other company, Lumend.  However, according to Executive Employee Witnesses 1, 2 and 3, financial, sales and marketing staff performed extensive due diligence and evaluation of Lumend over several months, including detailed sales and revenue forecasts and polling of customers, and concluded that an acquisition made no sense and could actually be damaging to FoxHollow's ongoing sales efforts.

66.     Certain of FoxHollow's executive officers – including Martin, Hoffman and Trigg – informed Simpson and Thomas that an acquisition made no sense and involved inferior

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

1  technology.  Indeed, the only two executive officers that were in favor of acquiring Lumend were

2  personally related to Simpson – Duke Rohlen, Simpson's son-in-law, and Matt Ferguson,

3  Rohlen's brother-in-law.

4        67.    At first, Simpson and Thomas attempted to coerce Martin and Hoffman to change

5  their minds with special perquisites.  According to Executive Employee Witness 1, Thomas

6  separately told both Martin and Hoffman that they would have the opportunity to personally run

7  Lumend.  Both rejected the offer.  Eventually, Simpson grew tired and increasingly irritated at

8  the executive team's refusal to purchase Lumend, and with Thomas' inability to secure Martin,

9  Hoffman and Trigg's consent.

10        68.    For example, according to Executive Employee Witness 1, Duke Rohlen

11  (Simpson's son-in-law) took Martin went out to lunch near FoxHollow's offices and tried to

12  convince him to comply with the Lumend acquisition.  When Martin refused, citing the problems

13  of the Lumend deal and the fact that Simpson had a clear conflict of interest in actively

14  promoting the deal to FoxHollow management, Rohlen asked in exasperation, "What am I going

15  to tell my father-in-law?"  Martin replied, "Tell him the truth."  Thereafter, Simpson took  Martin

16  aside at told him without any provocation that "you're never going to be CEO," an obvious

17  threat.

18        69.    According to Executive Employee Witness 2, Rohlen took Trigg to a FoxHollow

19  conference room to try to persuade her to sign on to the Lumend Transaction.  Trigg had

20  personally completed a marketing analysis of the Lumend transaction, including a detailed sales

21  model which looked at the anticipated number of accounts and monthly sales expected to be

22  driven by the Lumend technology.  Trigg told Rohlen that it was a bad product, that there was not

23  enough revenues to justify the acquisition, and that Simpson's personal involvement created a

24  conflict of interest.  Thereafter, Simpson took Trigg aside and sarcastically asked whether it was

25  "you guys" (i.e., Martin, Hoffman and Trigg) or Thomas that were "running the company,"

26  referring to their decision against proceeding with Lumend.  Simpson then told Trigg, who was

27  about to take a maternity leave, that he was going to go forward with Lumend "with or without

28  you."

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

70.     According to Executive Employee Witness 3, Simpson maintained a physical office at FoxHollow's headquarters.  In June 2005, Simpson set up a meeting with Martin and Hoffman in a meeting room at headquarters to discuss their refusal to sign on to acquiring Lumend.  When Martin was running late, Simpson and Hoffman sat down together and started talking.  Simpson asked what he needed to do to convince Hoffman that Lumend was a worthwhile project.  Hoffman replied that Lumend would never work for FoxHollow's business model and then proceeded to list all of the reasons.  After Hoffman finished, Simpson told him over and over again, six or seven times, "Not afraid of you Hoffman," "Not afraid of you Hoffman."

71.     At one point, according to Executive Employee Witnesses 1 and 3, Simpson cleaned out at his desk and stormed out of FoxHollow's offices, stating he was quitting.  At a subsequent executive team meeting, Duke Rohlen told Hoffman that Simpson had resigned from the Board, at which point Hoffman responded, "quick, lock the door."

### 1.     Simpson's August 28, 2005 Threat To Executive Staff

72.     On or about August 28, 2005 – the start of the Class Period –  Simpson told Thomas that the Lumend acquisition would go forward, with or without the executive officers' consent, that his decision had been approved by the Board, that it was final and non-negotiable, and that executive team members would be asked to resign if they refused to go along with the Lumend acquisition.  Simpson ordered that the transaction be closed by the end of the week. Given the public's perception about the state of affairs at FoxHollow, defendants has a duty to disclose this information – an order by the Chairman to executive management to breach their fiduciary duty or else risk termination – to the public market.

73.     Simpson had the power to issue and enforce his threat.  Simpson was serving as Chairman of the Board, a paid "consultant" to the Company, and FoxHollow's largest individual shareholder.  His family members and close friends occupied positions on FoxHollow's executive management team and followed his directions.  Simpson selected every member of FoxHollow's Board of Directors, including his medical partner who served on FoxHollow's Compensation Committee.

74.     However, according to Executive Employee Witnesses 1, 2 and 3, Martin, Hoffman and Trigg refused to consent to Simpson's edict and told Thomas that they would not sign off on the Lumend transaction.  In or about September 2005, Simpson was forced to sell Lumend to another party.  Over the next 90 days, Simpson orchestrated the removal of Thomas, Martin and Hoffman.  Trigg was not removed as she then went out on maternity leave.

75.     On October 26, 2005, FoxHollow filed with the SEC a Form 8-K, signed by Thomas, and issued a press release, announcing its financial results for the third quarter of fiscal year 2005 ended September 30, 2005.  The Company reported revenue for the third quarter was $36.1 million, a 26% increase over revenue of $28.7 million in the second quarter of 2005 and a 212% increase over revenue of $11.6 million in the third quarter in 2004.  The Company reported a gross margin of 73% versus 69% in the prior quarter and 40% in the third quarter of 2004.  Net loss for the quarter was $1.5 million, compared to a net loss of $3.4 million in the second quarter of 2005 and a net loss of $7.4 million in the third quarter of 2004.  Excluding stock-based compensation expenses, ***FoxHollow actually reported net income for the first time***.  The 8-K did not mention Simpson's decision to terminate FoxHollow's executive management who failed to authorize the Lumend acquisition.

76.     On the same day, FoxHollow held an Earnings Conference Call for analysts. Thomas, Rohlen and Ferguson participated on the call for FoxHollow.  Analysts participants included Mike Weinstein from J.P. Morgan, Jason Mills from First Albany, Tom Gunderson from Piper Jaffray, Amit Bhalla of Morgan Stanley, and Ben Andrew from William Blair.  After reporting extensively on FoxHollow's reported successes outlined in its 8-K, including a profitable quarter, the expansion of its manufacturing facility, and a new collaboration agreement with Merck, Thomas personally "thank[ed] and congratulate[d] all the members of the FoxHollow team for their efforts and results.  The performance over the past 2 years is nothing short of remarkable and we are all energized by the new hawks that are coming in with the mindset of taking this opportunity to the next level."  At the end of the call, a company representative, believed to be Thomas, concluded, "We couldn't be happier."

77.    On November 1, 2005, FoxHollow filed with the SEC its Form 10-Q for the third quarter of 2005, signed by defendant Ferguson.  FoxHollow reported its financial results for the third quarter, including record quarterly revenues.

78.    According to Executive Employee Witnesses 1, 2 and 3, on or about Thursday, December 8, 2005, Martin, Hoffman and Trigg were suddenly called to a meeting – believed to be at the Menlo Park offices of outside director, Jeff Child – and interviewed individually by Board representatives about what they knew about Thomas and his interaction with Simpson with respect to Lumend.

79.    On or about Saturday, December 10, 2005, Martin, Rohlen, Ferguson, and Rod Steckel were asked to attend a meeting at the Palo Alto offices of Wilson Sonsini, FoxHollow's corporate counsel.  Certain Board members, including Sandy Fitch, Myrtle Potter and Simpson also attended.  According to Executive Employee Witness 1, Martin was informed that Thomas' departure from FoxHollow would be announced the following Monday and that the Board was adopting a "leadership committee" of four members, Martin, Rohlen, Ferguson and Steckel to take over Thomas' responsibilities.  According to Executive Employee Witness 1, this committee was set up to neutralize the influence of Martin following Thomas' departure until such time as he too could be removed.  Simpson had already been appointed as "Interim CEO" making the committee irrelevant.  Further, at the December 10 meeting, Fitch confronted Martin with unfounded accusations about his performance as COO, including allegations of "channel stuffing."  Such concerns had never been raised with Martin before.

2.    **The December 12, 2005 Announcement of Thomas' "Resignation"And Reassurance About The Status Of The Remaining Management Team**

80.    On Monday, December 12, 2005, after the close of trading, FoxHollow filed a Form 8-K with the SEC, signed by Thomas, and issued a press release entitled, "FoxHollow Technologies Announces Management Transition."  FoxHollow reported that Thomas had "informed the Company's Board of Directors that he will be retiring" as President and CEO and resigning from the Board effective January 1, 2006 – i.e., just two weeks later.  FoxHollow also announced that Simpson would replace Thomas as "interim" CEO.  Simpson stated, "I have

1    maintained a very active role with the Company and look forward to leading our outstanding

2    group of senior management until we have named a replacement.  We will be looking for a

3    permanent chief executive officer who has extensive leadership experience and who can lead the

4    Company through its next stage of growth."

5        81.    The 8-K and press release were materially misleading.  Thomas did not

6    voluntarily resign.  Rather, Simpson told Thomas that he would be replaced back if he didn't

7    implement the Lumend acquisition back in August 2005, and was thereafter forced to resign, i.e.,

8    fired.  Just days earlier, the Board had met with executive officers and interrogated them about

9    Thomas and his role with Lumend.  Further, Simpson did not intend on leading its present senior

10   management nor view them as "outstanding."  To the contrary, Simpson planned to replace

11   Martin and Hoffman just a few weeks later, and had already embarked on a plan to force their

12   removal, either voluntarily or involuntarily.

13       82.    In response to FoxHollow's announcement, Herb Greenberg of Marketwatch

14   opined that "there is more to the story" and "raised a red flag over the sudden retirement

15   announcement of FoxHollow CEO Robert Thomas."  Greenberg stated: "Foxhollow announced

16   after the market close that CEO Robert Thomas (who also was the unabashed head of the

17   company's cheerleading team) 'informed' the board that effective January 1 he will be 'retiring.'

18   Retiring?  Oh, please!  He's 44.  At 44, you don't retire: You quit or you are fired."

19       83.    According to AP reports, Piper Jaffray analyst Tom Gunderson stated in a

20   research report, "There is a strong feeling of another shoe to drop in this story."

21       84.    To quell such speculation, FoxHollow decided to hold a "Management Transition

22   Conference Call" for analysts on December 12.  Thomas, Ferguson, and Simpson participated on

23   the call for FoxHollow.  Analysts participants included a representative from J.P. Morgan, Tom

24   Gunderson from Piper Jaffray, David Lewis of Thomas Weisel, Matt Duncan of Stephens, Amit

25   Bhalla of Morgan Stanley, and David Zimbalist of Natexis.  In response to analyst concerns

26   about other management changes, both Simpson and Thomas emphasized the Company's

27   confidence in the remaining members of management and their expected longevity.  Simpson

28   stated that FoxHollow expected a smooth CEO transition "based on our success and strong

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

FIRST AMENDED COMPLAINT

21

management team we have in place." Commenting on Thomas' departure, Simpson stated, "He leaves us in very good shape with a strong management team." Echoing these comments, Thomas stated, "We also feel like the management team here is incredible." When one analyst asked why Thomas, seemingly on top of the world, would suddenly leave FoxHollow with just two weeks notice, Thomas responded:

> "Yeah. It's, as I mentioned before, it's really for personal reasons. I really want to spend more time with my six-year-old daughter, as well as my wife, and do some of the things that I've put off for quite some time. As we also mentioned in the script ... I just want to take a step back."

At another point, Thomas stated, "This is more about me wanting to take a step back but nothing having to do with the Company and where we're going" and reiterating that he left "to reconnect with my family and friends." Simpson also represented, with respect to the timing of the consideration of Thomas' departure, that "it's perfectly logical that Boards ... have an ongoing dialogue" about the departure of their CEO and that it "was these kinds of discussion that led to more serious dialogue with Robert over the past several months about his own plans and intentions for the future."

85.     The comments described above, made during the December 12, 2005 conference call, were materially misleading. Thomas did not voluntarily resign for "personal" reasons unrelated to his work at FoxHollow, nor had such plans been in the works for "the past several months." Rather, Simpson told Thomas that he would be replaced back if he didn't implement the Lumend acquisition back in August 2005, and Thomas had been forced to resign, i.e., fired. Just days earlier, the Board had met with executive officers and interrogated them about Thomas and his role with Lumend. Further, Simpson did not believe he had a "strong management team," and his statement left the false impression that no further management changes were contemplated. However, Simpson planned to replace Martin and Hoffman just a few weeks later, and had already embarked on a plan to force their removal.

86.     Simpson also failed to mention that, as of the December 12, 2005 conference call, FoxHollow was already negotiating a special "Separation Agreement" with Thomas. Based on the stated "personal" reasons for his sudden departure, Thomas stood to lose the right to exercise

LAW OFFICES
COTCHETT,
PITRE &
McCARTHY

1    unvested options worth millions of dollars.   Under the Agreement, many of Thomas' options

2    were immediately vested.  According to Executive Employee Witness 3, this money was

3    perceived by others to be "hush money" to keep quiet about the real reason for his dismissal.

4    Thomas also agreed to a "No Cooperation" clause, requiring that "he will not counsel or assist

5    any attorneys or their clients in the presentation or prosecution of any disputes, differences,

6    grievances, claims, charges or complaints" against FoxHollow or any of its officers or directors.

7    Thomas further agreed to a "Post-Termination Assistance" clause, requiring him to provide

8    "information and assistance" to FoxHollow in connection with any "governmental investigation

9    or litigation."

10         87.   The sudden news of Thomas' departure was devastating to shareholders.  On

11    December 13, 2005, FoxHollow's share price plunged from $46.12 to $38.97, a 15.5% drop.

12    The trading volume was massive, with over 4.5 million shares traded – the second largest trading

13    day in the Company's history.  Within one week, FoxHollow was trading below $31 per share, a

14    loss of **one-third** of its market capitalization or over ***$375 million***.

15         88.   This substantial drop was only tempered by Thomas' and Simpson's assurances

16    that the departure was routine and that the Company had complete confidence in the existing

17    management team, including Martin and Hoffman.  For example, in an analyst report issued on

18    December 13, 2005, William Blair analyst Ben Andrew, who had closely followed FoxHollow

19    and participated in previous conference calls with management, remarked:

20        While there is sure to be speculation regarding alternative motives for his
         decision, we take Mr. Thomas' word at face value given the high level of

21        credibility he has developed since taking the company public roughly 14 months
         ago.  While the loss of Mr. Thomas and the uncertainty of his successor raises the

22        risk profile of the company, we believe ***the depth in the company's executive***
         ***ranks is strong enough to continue the momentum FoxHollow has generated***

23        ***recently***.

24    Emphasis added.  In another report issued on January 3, 2006, William Blair's Andrew stated:

25        One of our key concerns stemming from this management change would be
         ***turnover in the sales and marketing organization***. . . While appointing a new

26        CEO is an important step for the company, we would more immediately focus
         investors' attention on the existing, exceptional managers of the sales and

27        marketing organization that has been critical in establishing the company's
         powerful culture and high energy level (both of which have likely elevated

28        external interest in these individuals).  Should one or two of these individuals

choose to leave FoxHollow in an orderly manner, we believe the organization and the culture would survive. **_However, if we see significant defections from among this group, we would view that as cause for increase concern_**.

Emphasis added.

89.     Again, such concern turned out to be warranted.  As of December 12, 2005, at the same time Simpson was reassuring analysts that further management changes were not contemplated, Simpson had already made the decision to replace both Martin and Hoffman.  According to Executive Employee Witness 3, Ferguson and Rohlen stripped Hoffman, the well-respected head of FoxHollow's sales operations – of almost all of his primary job responsibilities and started to phase him out as a manager altogether in a clear effort to force Hoffman's resignation.  Hoffman was no longer consulted on quarterly and annual guidance provided to analysts for revenue forecasts and sale professional hiring plans, which were his responsibility prior to August 2005.  FoxHollow discussed reducing sales compensation levels to the sales team, again bypassing Hoffman.  Hoffman was no longer invited to market analysis meetings, which he presided over before.  On January 11, 2006, Hoffman angrily submitted his letter of resignation.

90.     Similarly, according to Executive Employee Witness 1, as of December 10, 2005, Martin was demoted by Simpson and the Board to a nominal position on a four-person "leadership committee" along with Ferguson, Rohlen and Ron Steckel, and stripped of substantive authority at the Company.  Martin was all of a sudden subject to accusations of wrongdoing by Board members, such as Sandy Fitch and Myrtle Potter, who had barely even spoken to Martin before.

91.     On January 9, 2006, FoxHollow filed with the SEC its Form 8-K, signed by Ferguson, and issued a press release, announcing its preliminary financial results for the fourth quarter ending December 31, 2005 and the full fiscal year 2005, as well as to give guidance for the first quarter and full fiscal year of 2006.  While the Form 8-K, signed by defendant Ferguson, indicated that previously forecasted revenue for the fourth quarter and the full year 2004 remained on course, there was no mention of the management "transition."  Instead, Simpson

touted the results reached on Thomas' watch, stating "Our tremendous growth in 2005 and growth outlook for 2006 is based on our success in driving adoption for existing customers, as well as the significant increase of our customer base.  Revenues for 2005 more than tripled from 2004.  Our outlook for 2006 represents a more than 60 percent growth in year-over-year revenue."

92.     In a related analyst call that same day, January 9, 2006, Simpson stated, "We have initiated a search for a new chief executive officer and have selected the firm of Spencer Stuart to assist us with that search.  While looking forward to the completion of the search process, *we are confident in the abilities of the senior management team already in place*." Emphasis added.

93.     Just two weeks later, just as the market activity in FoxHollow's stock started to stabilize from the sudden and unexpected departure of its CEO, a much different picture of senior management was revealed.

94.     On January 26, 2006, FoxHollow filed with the SEC its Form 8-K, signed by defendant Ferguson, and issued a press release, announcing that Martin was being replaced as Chief Operating Officer and Hoffman was being replaced as Vice President of Sales.  Rohlen, Simpson's son-in-law, was promoted to President of Strategic Operations and Ferguson remained as CFO.  Simpson explained, "Based on the new strategic initiatives we announced earlier this month, it is appropriate to effect this transition at this time."

95.     On January 26, 2006, analysts at Piper Jaffray released a report concerning FoxHollow entitled "Something Seems Amiss."  Piper Jaffray stated:

> We recently upgraded FOXH on valuation, after its 33% decline due to the uncertainty of 2006 revenues and the sudden resignation of the CEO. We are now inserting some caution on our short-term views. We have new worries related to additional management shakeups, possibly the VP of Sales and/or the COO.  In our opinion, while neither would be a big loss fundamentally, we are left wondering why the news flow from FOXH is so uneven and what the underlying cause is for the potential management disruption.
>
> We have been tracking down rumors (part of the job description these days) of management departures. We have not been able to confirm the rumors, but we are concerned by the lack of denial by management. In our opinion, true or not true, the rumors are gaining enough substance to engender comment from the company.
>
> The uncertainty of "what's really wrong" can only be partially balanced by



1   our channel checks that indicate a strong market for FOXH's products in
2   2006. We cannot assure investors that all is right inside the company; in our
    opinion, risk has increased.

3   96.    On the news, FoxHollow's share price fell 7% the next trading day and about 15%

4   within three days, reaching a new yearly low of $23.35.

5   97.    Collectively, after public revelation of FoxHollow's management "transition," the

6   end result of Simpson's undisclosed edict to Company management to acquire Lumend or else be

7   terminated, plaintiff and Class members lost *50%* of their stock value in just over one month.

8   The total market value loss is over ***$600 million***.  FoxHollow's stock value never recovered from

9   the revelation of this material information, and continued trading under $25 per share despite

10  reportedly record revenues.

11  98.    FoxHollow later announced that Simpson was changing his title from the

12  "interim" CEO to the permanent CEO.   Simpson attributed the Company's sales success to its

13  "strong management team" – i.e., his son-in-law, Duke, and his brother-in-law, defendant

14  Ferguson.  On the news that Simpson was remaining as CEO, the stock dropped more than 10%.

15  **VI.    LOSS CAUSATION/ECONOMIC LOSS**

16  99.    During the Class Period, as detailed herein, defendants engaged in a scheme to

17  deceive the market and a course of conduct that artificially inflated FoxHollow's stock price and

18  operated as a fraud and deceit on Class Period purchasers of FoxHollow common stock.

19  Material information about Simpson's edict to Company management to acquire Lumend, and

20  his decision to terminate senior management if and when they refused to follow the edict, was

21  concealed.  Further, when defendants finally chose to speak about the CEO's departure, and their

22  satisfaction with other executive officers, they misrepresented the true facts, including that the

23  CEO had been forced to resign rather than "retire" voluntarily and that the Company planned to

24  replace the next two highest ranking officers, including the COO and VP of Sales.  When the

25  result of such edict, the sudden and unexpected departure of the three highest ranking members

26  of management, and the true "state of affairs" at FoxHollow was disclosed and became apparent

27  to the market, the price of FoxHollow stock fell precipitously on massive trading volume as the

28  prior artificial inflation came out of FoxHollow's stock price.  As a result of their purchases of

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

FoxHollow common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, i.e., damages under the federal securities laws.

100.    An illustration of FoxHollow's share trading price, including periods immediately prior to and following the Class Period, readily confirms the causal impact of FoxHollow's revelation of the management turmoil and terminations in December 2005 and January 2006, following months of steady increases based on positive reports to the public markets:



**VII.    FRAUD-ON-THE-MARKET DOCTRINE**

101.    At all relevant times, the market for FoxHollow common stock was an efficient market for the following reasons, among others: (1) the Company's common stock met the requirements for public listing and was listed and actively traded on the Nasdaq National Market, a highly efficient market, (2) as a regulated issuer, the Company filed periodic public reports with

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

1   the SEC, and (3) the Company regularly issued press releases which were carried by national

2   news wires.  Each of these releases was publicly available and entered the public marketplace.

3       102.    As a result, the market for FoxHollow's common stock promptly digested current

4   information with respect to the Company from all publicly available sources and reflected such

5   information in the price of the Company's common stock.  Under these circumstances, all

6   purchasers of the Company's common stock during the Class Period suffered similar injury

7   through their purchase of the common stock of FoxHollow at artificially inflated prices and a

8   presumption of reliance applies.

9   **VIII.   ADDITIONAL SCIENTER ALLEGATIONS**

10      103.    As alleged herein, defendants acted with scienter in that defendants knew that the

11  public documents and statements issued or disseminated in the name of the Company were

12  materially false and misleading; knew that such statements or documents would be issued or

13  disseminated to the investing public; and knowingly and substantially participated or acquiesced

14  in the issuance or dissemination of such statements or documents as primary violations of the

15  federal securities laws.  As set forth elsewhere herein, defendants, by virtue of their receipt of

16  information reflecting the true facts regarding FoxHollow, their control over, and/or receipt

17  and/or modification of FoxHollow's materially misleading misstatements and/or their

18  associations with the Company which made them privy to confidential proprietary information

19  concerning FoxHollow, participated in the fraudulent schemed alleged herein.

20      104.    Defendants knew and/or recklessly disregarded the falsity and misleading nature

21  of the information which they caused to be disseminated to the investing public.  The ongoing

22  fraudulent scheme described herein could not have been perpetrated over a substantial period of

23  time, as has occurred, without the knowledge and complicity of the defendants.

24      105.    Defendants had the motive and opportunity to perpetrate the fraudulent scheme

25  and course of business described herein.  Simpson and his affiliates were substantial shareholders

26  in FoxHollow as well as Lumend.  As the founder, largest shareholder, and Chairman of

27  FoxHollow, Simpson helped to issue statements and press releases on behalf of FoxHollow and

28  had the opportunity to commit the fraud alleged herein.

IX.     **CAUSES OF ACTION**

**First Cause of Action**

**Violation of §10(b) of the 1934 Act and Rule 10b-5**

106.    Plaintiff hereby incorporates all of the foregoing paragraphs.

107.    During the Class Period, defendants disseminated and approved false and misleading statements and omitted to state material facts necessary in order to make the statements not misleading under the circumstances.  In doing so, defendants created an impression of affairs that differed in a material way from the one that actually existed.  By disclosing information to the public about increasing revenues and efforts to secure long-term employment of management, defendants assumed a duty to speak fully and truthfully on those subjects.   By failing to disclose Simpson's edict to management to acquire Lumend or be replaced, and by later misrepresenting the reasons for Thomas' departure and the Company's satisfaction with other executive officers, defendants disseminated and misleading statements while concealing and omitting material facts which they had a duty to disclose.

108.    The scheme, misrepresentations and concealments described herein affirmatively created an impression of a state of affairs that differed in a material way from the one that actually existed.  Defendants created a false impression of a stable company which valued its employees and management.  Defendants disclosed to investors not only that they were pleased by the performance of management but were making every effort to retain them.

109.    Defendants, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to misrepresent and conceal adverse material information about FoxHollow and its own internal operations, as specified herein.

110.    As a result of the scheme, misrepresentations and failure to disclose material facts, as set forth above, the prices of the FoxHollow stock paid by Plaintiff were distorted during the Class Period such that they did not reflect the risks and costs of the continuing course of conduct alleged herein.  In ignorance of these facts that prices of the stock were distorted by virtue of the concealed information identified herein, which withheld facts would have been material to a

1    reasonable investor similarly situated in making the decision to purchase the stock, Plaintiff and

2    the other members of the Class acquired the stock during the Class Period at distorted prices and

3    were damaged.

4    111.    The fraudulent scheme, including the misrepresented and concealed information,

5    was the proximate cause of Plaintiff's and the Class' investment losses since the very

6    circumstances that caused the loss represented by the decline in the FoxHollow stock price was

7    within the zone of risk misrepresented and/or concealed by defendants, such that the loss was

8    foreseeable and caused by the materialization of the misrepresented and/or concealed risk.  Thus,

9    there is a link between the subject of the misrepresentations and/or omissions and the loss such

10   that the subject was the cause.  The information misrepresented and/or concealed by defendants,

11   described herein, disguised the precise circumstances to which Plaintiff and the Class fell victim.

12   Defendants concealed circumstances that foreseeably caused Plaintiff's losses.

13   112.    At the time of said misrepresentations and/or omissions, Plaintiff and other

14   members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff

15   and other members of the Class known of the truth, which was not disclosed by defendants,

16   Plaintiff and other members of the Class would not have purchased or otherwise acquired the

17   stock.

18                              **Second Cause of Action**

19                     **Violation of §20(a) of the 1934 Act**

20   113.    Plaintiff hereby incorporates all of the foregoing paragraphs.

21   114.    Simpson acted as a controlling person of FoxHollow within the meaning of

22   Section 20(a) of the Exchange Act as alleged herein.  By virtue of his high-level positions, his

23   ownership and contractual rights, participation in and/or awareness of the Company's operations

24   and/or intimate knowledge of the statements filed by the Company with the SEC and

25   disseminated to the investing public, Simpson had the power to influence and control and did

26   influence and control, directly and indirectly, the decision-making of the Company, including the

27   content and dissemination of the various statements which Plaintiff contends are false and

28   misleading.  Simpson was provided with or had unlimited access to copies of the Company's

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

FIRST AMENDED COMPLAINT

30

reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

115. Simpson had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

116. As set forth above, FoxHollow and Simpson each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this complaint. By virtue of his positions as a controlling person, Simpson is liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of FoxHollow's and Simpson's wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## X. <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff, on behalf of himself and the Class, prays for judgment as follows:

1. Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class defined herein, and declaring Plaintiff to be a proper Class representatives and Plaintiff's counsel as counsel for the Class;

2. Awarding Plaintiff and all members of the Class compensatory damages and exemplary damages in an amount to be proven at trial;

/ / /

/ / /

/ / /

1       3.     Awarding Plaintiff and members of the Class pre-judgment interest, as well as

2  expert witness fees and other costs;

3       4.     Awarding such other relief as this Court may deem just and proper.

4  Dated: October 19, 2007            COTCHETT, PITRE & McCARTHY

5

6                              By:        /S/
                                  MARK C. MOLUMPHY

7                          JOSEPH W. COTCHETT (#36324)
                          jcotchet@cpsmlaw.com

8                          MARK C. MOLUMPHY (#168009)
                          mmolumphy@cpsmlaw.com

9                          LAURA SCHLICHTMANN (#169699)
                          lschlichtmann@cpmlegal.com

10                       SEAN E. PONIST (#204712)
                          sponist@cpmlegal.com

11                       COTCHETT, PITRE & McCARTHY
                        840 Malcolm Road, Suite 200

12                       Burlingame, CA 94010
                       Telephone: (650) 697-6000

13                       Fax: (650) 697-0577

14                       *Co-Lead Counsel for Lead Plaintiffs and Class*

15                       DAVID A.P. BROWER
                       brower@browerpiven.com

16                       ELIZABETH A. SCHMID
                       schmid@browerpiven.com

17                       BROWER PIVEN, A Professional Corporation
                       488 Madison Avenue, 8th Floor

18                       New York, NY 10022
                       Telephone: (212) 501-9000

19                       Fax: (212) 501-0300

20                       *Co-Lead Counsel for Lead Plaintiffs and Class*

21                       CHARLES J. PIVEN
                       piven@browerpiven.com

22                       BROWER PIVEN, A Professional Corporation
                       401 East Pratt Street, Suite 2525

23                       Baltimore, MD 21202
                       Telephone: (410) 332-0030

24                       Fax: (410) 685-1300

25                       *Co-Lead Counsel for Lead Plaintiffs and Class*

26

27

28

LAW OFFICES
COTCHETT,
PITRE &
McCARTHY

FIRST AMENDED COMPLAINT

1  SETH A SAFIER (#197427)
   seth@gutridesafier.com
2  MICHAEL R. REESE (# 206773)
   michael@gutridesafier.com
3  GUTRIDE SAFIER LLP
   835 Douglas Street
4  San Francisco, CA 94119
   Telephone: (415) 336-6545
5  Fax: (415) 876 - 4345

6  *Plaintiffs Liaison Counsel*

7  **JURY DEMAND**

8  Plaintiffs demands a jury trial on all issues so triable.

9  Dated: October 19, 2007          COTCHETT, PITRE & McCARTHY

10

11  By: _____/S/_____
                   MARK C. MOLUMPHY

12  JOSEPH W. COTCHETT (#36324)
    jcotchet@cpsmlaw.com
13  MARK C. MOLUMPHY (#168009)
    mmolumphy@cpsmlaw.com
14  LAURA SCHLICHTMANN (#169699)
    lschlichtmann@cpmlegal.com
15  SEAN E. PONIST (#204712)
    sponist@cpmlegal.com
16  COTCHETT, PITRE & McCARTHY
    840 Malcolm Road, Suite 200
17  Burlingame, CA 94010
    Telephone: (650) 697-6000
18  Fax: (650) 697-0577

19  *Co-Lead Counsel for Lead Plaintiffs and Class*

20  DAVID A.P. BROWER
    brower@browerpiven.com
21  ELIZABETH A. SCHMID
    schmid@browerpiven.com
22  BROWER PIVEN, A Professional Corporation
    488 Madison Avenue, 8th Floor
23  New York, NY 10022
    Telephone: (212) 501-9000
24  Fax: (212) 501-0300

25  *Co-Lead Counsel for Lead Plaintiffs and Class*

26

27

28

LAW OFFICES
COTCHETT,
PITRE &
McCARTHY

FIRST AMENDED COMPLAINT

33

1    CHARLES J. PIVEN
     piven@browerpiven.com
2    BROWER PIVEN, A Professional Corporation
     401 East Pratt Street, Suite 2525
3    Baltimore, MD 21202
     Telephone: (410) 332-0030
4    Fax: (410) 685-1300

5    *Co-Lead Counsel for Lead Plaintiffs and Class*

6    SETH A SAFIER (#197427)
     seth@gutridesafier.com
7    MICHAEL R. REESE (# 206773)
     michael@gutridesafier.com
8    GUTRIDE SAFIER LLP
     835 Douglas Street
9    San Francisco, CA 94119
     Telephone: (415) 336-6545
10   Fax: (415) 876 - 4345

11   *Plaintiffs Liaison Counsel*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES
COTCHETT,
PITRE &
McCARTHY

FIRST AMENDED COMPLAINT