1

2

3

4

5

6

7                          UNITED STATES DISTRICT COURT

8                          NORTHERN DISTRICT OF CALIFORNIA

9

10

11

12   In re FOXHOLLOW TECHNOLOGIES,              No. C 06-4595 PJH
     INC., SECURITIES LITIGATION
13   _____

14   THIS ORDER RELATES TO:                     **ORDER GRANTING MOTION
     ALL ACTIONS                                TO DISMISS**
15   _____/

16          Defendants' motion to dismiss the first amended complaint came on for hearing

17   before this court on January 23, 2008.  Plaintiff appeared by his counsel Mark Molumphy,

18   and defendants appeared by their counsel Paula Blizzard and Robert VanNest.  Having

19   read the parties' papers and carefully considered their arguments, and good cause

20   appearing, the court hereby GRANTS the motion.

21                                    **INTRODUCTION**

22          This is a proposed class action alleging violations of federal securities laws.  Plaintiff

23   Matthew Roberts seeks to represent a class of individuals who purchased shares of stock

24   in defendant FoxHollow Technologies, Inc. ("FoxHollow" or "the Company").  The proposed

25   class period extends from August 28, 2005, to January 26, 2006.

26          Plaintiff alleges that defendant John B. Simpson, M.D. ("Simpson"), who founded

27   FoxHollow and took it public, attempted to persuade FoxHollow's officers and directors that

28   the Company should acquire LuMend, Inc. ("LuMend"), a privately-held company also

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

started by Simpson.  Plaintiff asserts that when certain officers and directors refused to accede to Simpson's request, he forced three executives to resign or caused them to be terminated; and that after FoxHollow announced that the officers were leaving, the price of the Company's stock dropped.

Plaintiff alleges that in failing to reveal this internal management disagreement prior to the actual departures of the officers, Simpson and FoxHollow violated § 10(b) of the 1934 Securities Exchange Act, and Rule 10b-5 promulgated thereunder, and that Simpson also is liable under § 20(b) of the Act as a control person.

Defendants now seek an order dismissing the first amended complaint ("FAC") for failure to state a claim.

**BACKGROUND**

A.    Pre-Class Period Allegations

FoxHollow, which was based in Redwood City, California, was founded by Simpson in 1996.[1]  Its sole product was "SilverHawk," a medical device used to treat peripheral artery disease ("PAD"), which results from the accumulation of plaque in arteries. Silverhawk is a catheter that is inserted inside a clogged artery.  A spinning blade within the catheter cuts through and removes plaque.  FAC ¶ 2.

At the same time that Simpson founded FoxHollow, he formed LuMend.[2]  LuMend had one primary product, "Frontrunner," also a catheter inserted into an artery to penetrate plaque blockages and treat PAD.  Unlike SilverHawk, however, Frontrunner does not remove the plaque, but rather creates an opening so that other treatments can be used. FAC ¶¶ 3, 37.

---

[1]  On October 11, 2007, FoxHollow merged with ev3, Inc., of which it is now a wholly-owned subsidiary.

[2]  Simpson formed LuMend with his medical partner Matthew Selmon, M.D. ("Selmon"). FAC ¶ 36.  Tomoaki Hinohara, M.D. ("Hinohara"), who practices with Simpson and Selmon in Redwood City, helped invent and develop the LuMend technology and is listed as a co-inventor on several patents issued to LuMend, or on patent applications made by LuMend. FAC ¶ 40.  Both FoxHollow and LuMend were financially backed by Simpson, through DeNovo Ventures ("DeNovo"), a venture capital firm founded by Simpson and Richard Ferrari ("Ferrari") in Menlo Park in 2000.  FAC ¶ 38.

United States District Court

For the Northern District of California

1    In September 2004, Simpson began preparations to take FoxHollow public.  At the

2 time, the Company had eight executive officers, including Chief Executive Officer Robert

3 Thomas ("Thomas"); Chief Financial Officer Matthew Ferguson ("Ferguson"); Chief

4 Operating Officer David Martin ("Martin"); Vice-President of Sales William Hoffman

5 ("Hoffman"); and Vice-President of Marketing Leslie Trigg ("Trigg").[3]  The members of the

6 Board of Directors were Simpson, Hinohara, Ferrari, Thomas, Ryan Drant ("Drant"), and

7 Sanford Fitch ("Fitch").  The Company had 217 employees, and had just completed a move

8 into a 61,000 square-foot facility in Redwood City.  FAC ¶¶ 44-45.

9    On October 27, 2004, FoxHollow filed a Registration Statement and Prospectus to

10 initiate its public offering.  FoxHollow offered 4.5 million shares of its common stock at an

11 initial price of $14.00 per share.  FAC ¶ 46.

12    FoxHollow's SEC filings from the time of the Registration Statement through August

13 2005 reported increasing revenues as well as expansion of Company facilities and a

14 growing workforce.  Plaintiff alleges that the public filings and other public statements

15 created a public impression that the Company was doing well and had top-rate

16 management.

17    On December 6, 2004, FoxHollow filed its Form 10-Q for the third quarter of 2004,

18 reporting net revenue of $11.6 million for 3Q04, compared with revenue of $650,000 for the

19 3Q03.  Revenue for the first nine months of 2004 was $23.9 million, compared to $876,000

20 for the first nine months of 2003.  FAC ¶ 47.

21    On February 14, 2005, FoxHollow filed a Form 8-K and issued a related press

22 release, announcing its results for the fourth quarter of 2004.  The Company announced

23 revenue of $14.7 million for 4Q04, compared with $11.6 million for 3Q04.  For the full year,

24 FoxHollow reported net revenue of $38.6 million, compared to $2.6 million for 2003.  FAC

25 ¶ 48.

26

27    ─────────────

28    [3]  Also employed at FoxHollow in some capacity at this time was Douglas ("Duke") Rohlen ("Rohlen").  FoxHollow disclosed to investors at the time of the initial public offering that Rohlen was Simpson's son-in-law, and that Ferguson was Rohlen's brother-in-law.

1       On March 28, 2005, FoxHollow filed its Form 10-K for 2004, which repeated the

2   year-end results announced on February 14, 2005.  The Company also announced that it

3   had increased its staff to 244 employees, noting, "We believe our future success will

4   depend on our ability to attract, hire and retain qualified personnel," and "We believe our

5   employee relations are good."  FAC ¶ 49.

6       On April 27, 2005, FoxHollow filed a Form 8-K and issued a related press release,

7   announcing its financial results for the first quarter of 2005.  The Company announced that

8   net revenue was $21.5 million, which represented a 46% increase over 4Q04 revenue

9   ($14.7 million), and a 350% increase over 1Q04 revenue ($4.8 million).  Net loss for the

10  quarter was $6.5 million, compared with a net loss of $7.5 million in 4Q04.  The Company

11  also indicated that it had 89 direct salespeople, compared with 69 as of 4Q04, and was on

12  track to have about 125 direct sales professionals by the end of 2005.  FAC ¶ 50.

13      Also on April 27, 2005, FoxHollow held an earnings conference call.  Thomas,

14  Rohlen, and Ferguson participated for FoxHollow, and other participants included analysts

15  from J.P. Morgan, First Albany, Piper Jaffray, and Thomas Weisel Partners.  After reporting

16  on FoxHollow's results for 1Q05, Thomas stated,

17          We are executing our plan by growing our sales force, increasing capacity
            and implementing effective marketing and sales programs. . . . [W]e believe
18          our story will only get better in the months and years ahead. . . . We believe
            we have the resources, technology, people and financials to realize our goals
19          not only with our core business but in other exciting areas as well.

20  Thomas added that FoxHollow had a "team that is executing on every level imaginable."

21  FAC ¶ 51.

22      On April 29, 2005, FoxHollow filed its Schedule 14A Proxy Statement,[4] announcing

23  the annual shareholder's meeting, and containing the Board's recommendation that

24  Thomas and Hinohara be re-elected for new three-year terms on the Board.  The Proxy

25  Statement also set forth the Company's compensation plan for executive officers.  FAC

26

27          [4] Plaintiff alleges that the Proxy Statement was filed on May 16, 2005, <u>see</u> FAC ¶ 53,
28  but the copy of the Proxy Statement posted on the SEC's website shows that the filing date
    was April 29, 2005.

United States District Court

For the Northern District of California

¶ 53.

As of the date the Proxy Statement was filed, FoxHollow's Compensation Committee consisted of Drant, Ferrari, and Hinohara.  Id.  The Compensation Committee reported that the major components of the compensation plan were base salary, plus cash bonuses, plus potential stock options.  With respect to the cash bonuses, the Committee reported that it had met and approved a special bonus plan for three officers – the Chief Executive Officer, the Chief Operating Officer, and the Chief Financial Officer (at that time, Thomas, Martin, and Ferguson).  This plan provided additional compensation conditioned on the achievement of revenue and performance goals.  FAC ¶ 54.

The Compensation Committee approved an additional bonus for the same three officers, in the event that the revenue and performance goals were exceeded, and stated that stock options would be awarded to FoxHollow's executive officers and other employees, "both as a reward for past individual and corporate performance and as an incentive for future performance."  Id.  In addition, the compensation table reflected that Thomas, Martin, and Hoffman had received salary raises from the previous year, and that all three had received cash bonuses and stock option grants.[5]  FAC ¶¶ 55-56.

Plaintiff asserts that the Proxy Statement's description of the option grants as "long-term compensation," as well as the fact that the option grants had a ten-year term, provided a clear indicator to the public market that FoxHollow wanted to retain Thomas, Martin, and Hoffman "for a long term" and to provide all three with financial incentives to remain at FoxHollow.  Id.

On May 13, 2005, FoxHollow filed its Form 10-Q for 1Q05.  Along with reporting the previously announced financial results, the Company stated, in the section headed "Factors Affecting Future Operating Results,"

---

[5]The Proxy Statement listed all FoxHollow's executive officers, and provided compensation details for the CEO and the other four most highly-paid executives.  Thus, in addition to the details for Thomas, Martin, and Hoffman, the compensation table showed that Ferguson had received a salary increase, and that Ferguson and Trigg had received bonuses and stock option grants.  There was no salary increase shown for Trigg because she was not a FoxHollow employee the previous year.

United States District Court

For the Northern District of California

1
2
3
4
5

> Our success largely depends on the skills, experience and efforts of our officers and other key employees. Any of our officers and other key employees may terminate their employment at any time. The loss of any of our senior management team could harm our business. . . . Failure to attract and retain personnel, particularly technical and sales and marketing personnel, would harm our ability to compete effectively and grow our business. The announcement of the loss of one of our key employees could negatively affect our stock price.

6 The Company also stated

7
8
9
10

> We may acquire companies, products or technologies that we believe to be complementary to the present or future direction of our business. If we engage in such acquisitions, we may have difficulty integrating the acquired personnel, financials, operations, products, or technologies. Acquisitions may dilute our earnings per share, disrupt our ongoing business, distract our management and employees, and increase our expenses, which could harm our business. . . .

11 FAC ¶ 52.

12       On May 18, 2005, the Adaptive Business Leaders organization presented Thomas

13 with its highest honor, the Platinum "ABBY" award, at the Seventh Annual Innovations in

14 Healthcare event and awards ceremony. A news announcement of this award on

15 PRNewswire on May 19, 2005, stated that Thomas was recognized for his work at

16 FoxHollow, and that the Company had generated more than $40 million in revenue over the

17 previous 12 months. FAC ¶ 57.

18       During the period between May 16, 2005, and May 26, 2005, FoxHollow's share

19 price climbed from about $30 per share to $40 per share. FAC ¶ 58.

20       On June 20, 2005, FoxHollow filed a Form 8-K, and issued a press release

21 announcing that Jeffrey Child had been added to FoxHollow's Board of Directors, filling a

22 vacancy left by the resignation of Ferrari on June 17, 2005. Plaintiff asserts that Child was

23 a "close friend and neighbor of Ferguson." FAC ¶ 59.

24       On July 27, 2005, FoxHollow filed a form 8-K, and issued a press release

25 announcing its financial results for the second quarter of 2005, including revenue of $28.7

26 million, a 33% increase over revenue of $21.5 million in 1Q05, and a 283% increase over

27 the 2Q04 revenue of $7.5 million. The net loss for the quarter was $3.4 million, compared

28 with a net loss of $6.5 million in 1Q05, and a net loss of $8.8 million in 2Q04. FAC ¶ 60.

United States District Court

For the Northern District of California

1    Also on July 27, 2005, FoxHollow held an earnings conference call.  Thomas,

2    Rohlen, and Ferguson participated for FoxHollow, and other participants included analysts

3    from J.P. Morgan, First Albany, Piper Jaffray, and William Blair.  During the conference call,

4    Thomas stated,

>    An important piece of the FoxHollow infrastructure story is our people.  We
>    are continuing to add to our bench strength with the addition of management
>    personnel in all areas of the Company.  I want to take this opportunity to
>    acknowledge the tremendous efforts of all of our employees throughout the
>    organization, including operations, R&D, sales, marketing, IT, the critical and
>    regulatory department, and our finance and administrative groups.

FAC ¶ 61.

On July 28, 2005, FoxHollow's stock price rose to an all-time high trading price of

$55.20.  On July 29, 2005, FoxHollow filed its Form 10-Q for 2Q05, which reported its

financial results for the second quarter, including record revenue.  FAC ¶ 62.

Plaintiff alleges that throughout the period from November 2004 through July 2005,

as FoxHollow released information regarding increasing sales and revenue in the above-

described public filings and statements, an internal conflict was brewing between Simpson

and certain officers and directors of the Company.

Plaintiff asserts that in November 2004, Simpson asked FoxHollow's management to

consider an acquisition of LuMend.  Plaintiff alleges that FoxHollow's financial, sales, and

marketing staff performed extensive due diligence and evaluation of LuMend over the next

several months, and at some point concluded that an acquisition made no sense and could

actually be damaging to FoxHollow's ongoing sales efforts.  Plaintiff bases these

allegations on information provided by "Executive Employee Witnesses 1, 2, and 3."[6]  FAC

¶ 65.

---

[6] Apart from allegations pertaining to plaintiff personally, plaintiff alleges the facts pled in the FAC on information and belief, "based upon, inter alia, the investigation conducted by plaintiff's counsel."  The investigation of counsel included a review of FoxHollow's financial condition, documents pertaining to FoxHollow and LuMend, regulatory filings, reports, analyst conference call transcripts, press releases, and media reports about the Company; and also included interviews with three "confidential witnesses," alleged to have been executive employees of FoxHollow during the relevant period.  Plaintiff refers to these "confidential witnesses" as "Executive Employee Witnesses 1, 2, and 3."

United States District Court

For the Northern District of California

1    Plaintiff claims that certain of FoxHollow's executive officers, including Martin,

2  Hoffman, and Trigg, informed Simpson and Thomas that an acquisition made no sense and

3  that LuMend involved inferior technology.  Plaintiff asserts that the only two executive

4  officers who were in favor of the acquisition were personally related to Simpson – Rohlen

5  (Simpson's son-in-law) and Ferguson (Rohlen's brother-in-law).  FAC ¶ 66.

6    Relying on information provided by Executive Employee Witness 1, plaintiff claims

7  that Simpson and Thomas first attempted to "coerce" Martin and Hoffman, by offering each

8  of them the opportunity to personally run LuMend.  However, both rejected the offer.  FAC

9  ¶ 67.

10    Plaintiff asserts that Rohlen took Martin to lunch and "tried to convince him to comply

11  with the Lu[M]end acquisition."  When Martin refused, citing the "problems" with the

12  LuMend deal, and asserting that Simpson had a conflict of interest in actively promoting the

13  deal to FoxHollow management, Rohlen allegedly "asked in exasperation, 'What am I going

14  to tell my father-in-law?'  Martin replied, 'Tell him the truth.'"  Thereafter, according to

15  plaintiff, Simpson told Martin, "[Y]ou're never going to be CEO," which plaintiff characterizes

16  as "an obvious threat."  FAC ¶ 68.

17    Relying on information provided by Executive Employee Witness 2, plaintiff asserts

18  that Rohlen also took Trigg aside to attempt to persuade her to sign on to the acquisition.

19  Trigg, who had completed a marketing analysis of the proposed transaction, allegedly told

20  Rohlen that LuMend's product was a bad product, that there were not enough revenues to

21  justify the acquisition, and that Simpson's personal involvement created a conflict of

22  interest.  Plaintiff claims that Simpson then took Trigg aside and asked whether it was "you

23  guys" (referring, according to plaintiff, to Martin, Hoffman, and Trigg) who were "running the

24  company" (referring to their refusal to agree to the acquisition of LuMend), or whether it

25  was Thomas.  Simpson allegedly told Trigg, who was about to go out on maternity leave,

26  that he was going to go forward with LuMend "with or without you."  FAC ¶ 69.

27    Relying on information provided by Executive Employee Witness 3, plaintiff alleges

28  that Simpson set up a meeting with Martin and Hoffman in a room at FoxHollow's

**United States District Court**
For the Northern District of California

1   headquarters, to discuss their refusal to agree to the acquisition of LuMend.  Plaintiff

2   asserts that before Martin arrived, Simpson asked Hoffman what he needed to do to

3   convince Hoffman that LuMend was a worthwhile project.  Hoffman replied that LuMend

4   "would never work for FoxHollow's business model," and listed all the reasons.  After

5   Hoffman had finished, Simpson allegedly told him, over and over, "six or seven times, 'Not

6   afraid of you Hoffman, Not afraid of you Hoffman.'"  FAC ¶ 70 (punctuation as in original).

7        Relying on information provided by Executive Employee Witnesses 1 and 3, plaintiff

8   also claims that at one point, Simpson cleaned out his desk and "stormed out of

9   FoxHollow's offices, stating he was quitting."  At a subsequent meeting, when Rohlen told

10  Hoffman that Simpson had resigned from the Board, Hoffman allegedly replied, "'[Q]uick,

11  lock the door.'"  FAC ¶ 71.

12  B.    Class Period Allegations

13       On August 28, 2005, the start of the class period, Simpson allegedly told Thomas

14  that the acquisition of LuMend would go forward, with or without the executive officers'

15  consent; that the decision had been approved by the Board; that it was final and non-

16  negotiable; and that executive team members would be asked to resign if they refused to

17  go along with the acquisition.  Simpson allegedly ordered that the transaction be closed by

18  the end of the week.  FAC ¶ 72.

19       Plaintiff asserts that because of "the public's perception about the state of affairs at

20  FoxHollow," defendants had a duty to disclose this information – "an order by the Chairman

21  to executive management to breach their fiduciary duty or else risk termination" – to the

22  public market.  FAC ¶ 72.

23       Plaintiff alleges that Simpson "had the power to issue and enforce his threat,"

24  because he was the Chairman of the Board, was serving as a paid "consultant" to the

25  Company, and was FoxHollow's largest individual shareholder.  Plaintiff claims that

26  Simpson's "family members and close friends occupied positions on FoxHollow's executive

27  management team and followed his directions."  Plaintiff alleges that Simpson had

28  "selected every member" of FoxHollow's Board, including his medical partner (Hinohara)

United States District Court
For the Northern District of California

1   who served on the Compensation Committee.  FAC ¶ 73.

2       Plaintiff asserts, however, based on information obtained from Executive Employee

3   Witnesses 1, 2, and 3, that Martin, Hoffman, and Trigg "refused to consent to Simpson's

4   edict" and told Thomas they would not sign off on the LuMend transaction.  Thus, according

5   to plaintiff, in September 2005, Simpson was "forced" to sell LuMend to another entity.

6   Plaintiff claims that over the following 90 days, Simpson orchestrated the removal of

7   Thomas, Martin, and Hoffman.  Trigg was not removed, according to plaintiff, because she

8   was on maternity leave.  FAC ¶ 74.

9       On October 26, 2005, FoxHollow filed a Form 8-K and issued a press release

10  announcing its financial results for the third quarter of 2005.  The Company reported

11  revenue of $36.1 million, a 26% increase over the $28.7 million revenue for 2Q05, and a

12  212% increase over the $11.6 million revenue for 3Q04.  Net loss for the quarter was $1.5

13  million, compared to a net loss of $3.4 million in 2Q05 and a net loss of $7.4 million in

14  3Q04.  FAC ¶ 75.

15      Also on October 26, 2005, FoxHollow held an earnings conference call.  Thomas,

16  Rohlen, and Ferguson participated for FoxHollow, and analyst participants included

17  analysts from J.P. Morgan, First Albany, Piper Jaffray, Morgan Stanley, and William Blair.

18  After reporting on FoxHollow's successes, Thomas thanked and congratulated the

19  "members of the FoxHollow team for their efforts and results," adding, "The performance

20  over the past 2 years is nothing short of remarkable and we are all energized by the new

21  Hawks that are coming in with the mindset of taking this opportunity to the next level."  A

22  FoxHollow representative stated, "We couldn't be happier."  FAC ¶ 76.

23      On November 1, 2005, FoxHollow filed its Form 1-Q for 3Q05, reporting financial

24  results for the quarter.  FAC ¶ 77.

25      Based on information provided by Executive Employee Witnesses 1, 2, and 3,

26  plaintiff alleges that on December 8, 2005, Martin, Hoffman, and Trigg were called to a

27  meeting, and were interviewed individually by Board representatives about what they knew

28  about Thomas and his interaction with Simpson regarding LuMend.  FAC ¶ 78.

On Saturday, December 10, 2005, Martin, Rohlen, Ferguson, and Rod Steckel ("Steckel") were allegedly asked (not clear by whom) to attend a meeting at the Palo Alto offices of FoxHollow's corporate counsel.  Certain Board members, including Fitch, Myrtle Potter, and Simpson also attended.  Based on information provided by Executive Employee Witness 1, plaintiff asserts that Martin was informed that Thomas' departure from FoxHollow would be announced the following Monday, and that the Board was adopting a "leadership committee" composed of Martin, Rohlen, Ferguson, and Steckel to take over Thomas' responsibilities.

According to Executive Employee Witness 1, this committee was set up to "neutralize" the influence of Martin until such time as he, too, could be removed.  Also at the December 10, 2005, meeting, Fitch allegedly confronted Martin with unfounded accusations about his performance as Chief Operating Officer, including allegations of "channel stuffing."  FAC ¶ 79.

On Monday, December 12, 2005, FoxHollow filed a Form 8-K and issued a press release entitled, "FoxHollow Technologies Announces Management Transition."  FoxHollow reported that Thomas had informed the Board that he would be "retiring" as President and Chief Executive Officer, and resigning from the Board effective January 1, 2006.  At this point, Thomas had worked at FoxHollow for nearly eight years.  FAC ¶ 80.

FoxHollow also announced that Simpson would become "interim" CEO, and that it was hiring a search firm to assist in the search for a new CEO.  The press release quotes Simpson as saying,

> I have maintained a very active role with the Company and look forward to leading our outstanding group of senior management until we have named a replacement.  We will be looking for a permanent chief executive officer who has extensive leadership experience and who can lead the Company through its next stage of growth.

FAC ¶ 80.

Plaintiff asserts that the 8-K and the press release were materially misleading, because Thomas was forced to resign, and because Simpson did not intend on "leading" the Company's present senior management, and did not view them as "outstanding."

11

United States District Court

For the Northern District of California

Rather, according to plaintiff, Simpson planned to replace Martin and Hoffman just a few weeks later, and had already embarked on a plan to force their removal, either voluntarily or involuntarily.  FAC ¶ 81.

Plaintiff asserts that in response to FoxHollow's announcement, Herb Greenberg of Marketwatch stated, "There is more to the story."  He also allegedly stated, "He's 44.  At 44, you don't retire: You quit or you are fired."  FAC ¶ 82.  Piper Jaffray analyst Tom Gunderson allegedly stated, "There is a strong feeling of another shoe to drop in this story." FAC ¶ 83.

Also on December 12, 2005, FoxHollow held a "management transition" conference call.  Thomas, Ferguson, and Simpson participated for FoxHollow, along with analysts from J.P. Morgan, Piper Jaffray, Thomas Weisel, Stephens, Morgan Stanley, and Natexis.  FAC ¶ 84.

In explaining the timing of the announcement, Simpson stated,

[I]t's perfectly logical that Boards and management will always be cognizant about the issues of succession and have an ongoing dialog about it.  It was these kinds of discussions that led to more serious dialog with [Thomas] over the past several months about his own plans and intentions for the future.  In addition, we recognize that it could be very difficult for us to conduct a meaningful search for a new CEO without facing the risk of a leak or inadvertent disclosure.

Transcript of December 12, 2005, conference call.

Before turning the call over to Thomas, Simpson stated that Thomas "leaves us in very good shape with a strong management team, an excellent market position, fueled by increasing adoption, a growing sales force, and a strategy to achieve continued growth in the future."  He added, "We feel confident, based on our success and strong management team we have in place, that there will be no shortage of interested, highly-qualified candidates interested in this opportunity."  Id.

Thomas stated that his immediate plans were to "reconnect with my family and friends, try to shave a stroke or two off my golf game, and pursue some personal interests." Id.  When one analyst asked, in view of the fact that "right now the FoxHollow CEO gig is a pretty good place to be," why Thomas' "time was up and sort of what you've been thinking,"

United States District Court
For the Northern District of California

Thomas responded,

> Yeah. It's like I mentioned before, it's really for personal reasons. I really want to spend more time with my six-year-old daughter, as well as my wife, and do some of the things that I've put off for quite some time. As we also mentioned in the script, this is my third start-up in a row, and I've had to go really hard in each one, and at this point I just want to take a step back, and so aside from consulting for the Company, which is something I look forward to doing, I don't have any other plans.

Id.

At another point, in response to a question regarding whether there would be "some changes in emphasis going forward [at FoxHollow]," Thomas responded,

> We also feel like the management team here is incredible. I think they've demonstrated that performance. . . . We don't see any major structural change in our strategy on a go-forward basis, and certainly once the new CEO is brought in, they'll be part of helping with the longer-term strategy, but our mission at this point is very clear, to make and sell more SilverHawks and help more patients . . . . So there is no short-term or medium-term plans to change the strategy at all. This is more about me wanting to take a step back but nothing to do with the Company and where we're going.

Id.

Plaintiff alleges that the comments made at the December 12, 2005, conference call were misleading, particularly the references to the "strong management team" and Thomas' claims that he was leaving FoxHollow for "personal reasons," and the statement that the dialogue with Thomas had been ongoing for "the past several months." Plaintiff asserts that Thomas did not resign for "personal" reasons unrelated to his work at FoxHollow, and claims that the plans had not been in the works for "the past several months." Rather, plaintiff alleges, "Simpson told Thomas that he would be replaced back [sic] if he didn't implement the LuMend acquisition back in August 2005, and Thomas had been forced to resign, i.e., fired." FAC ¶ 85.

Plaintiff asserts that "[j]ust days earlier, the Board had met with executive officers and interrogated them about Thomas and his role with LuMend" (apparently referring to the allegations in FAC ¶ 78). Plaintiff claims that Simpson did not actually believe he had a "strong management team," and alleges that Simpson's statement left a false impression that no further management changes were contemplated. Plaintiff asserts that Simpson

13

United States District Court

For the Northern District of California

1    planned to replace Martin and Hoffman just a few weeks later, and had already embarked

2    on a plan to force their removal.  FAC ¶ 85.

3         Plaintiff also alleges that Simpson failed to mention, during the December 12, 2005

4    conference call, that FoxHollow was in the process of negotiating a special "Separation

5    Agreement" with Thomas.  Plaintiff claims that based on the alleged "personal reasons" for

6    his departure, Thomas stood to lose the right to exercise unvested options worth millions of

7    dollars, and that under the Separation Agreement, many of Thomas' options would be

8    immediately vested.  FAC ¶ 86.

9         Plaintiff asserts, based on information provided by Executive Employee Witness 3,

10   that "this money" (apparently referring to the options) was perceived by "others" as "hush

11   money," to compel Thomas to keep quiet about the real reason for his dismissal.  Thomas

12   allegedly also agreed to a "No Competition" clause, requiring, according to plaintiff, that

13   Thomas not "counsel or assist any attorneys or their clients in the presentation or

14   prosecution of disputes, differences, grievances, claims, charges, or complaints" against

15   FoxHollow or any of its officers or directors; and to a "Post-Termination Assistance" clause,

16   requiring that he provide "information and assistance" to FoxHollow in connection with any

17   "governmental investigation or litigation."  FAC ¶ 86.

18        Plaintiff alleges that the sudden announcement of Thomas' departure was

19   "devastating" to shareholders, as the price of FoxHollow's stock fell 15.5% on December

20   13, 2005, from $46.12 to $38.97.  Plaintiff asserts that within one week, FoxHollow was

21   trading below $31 per share, and had lost more than 1/3 of its market capitalization.  FAC

22   ¶ 87.

23        Plaintiff claims that this drop in the stock price was only tempered by Thomas' and

24   Simpson's assurances that Thomas' departure was routine, and that the Company had

25   confidence in the existing management team.  Plaintiff cites analysts' reports stating, in

26   essence, that any additional departures of Company executives would be cause for alarm.

27   See FAC ¶ 88.

28        Plaintiff alleges that as of December 12, 2005, when Simpson reassured analysts

14

United States District Court

For the Northern District of California

1  that further management changes were not contemplated,[7] he had already made the

2  decision to replace both Martin and Hoffman.  Based on information obtained from

3  Executive Employee Witness 3, plaintiff asserts that Ferguson and Rohlen stripped

4  Hoffman of almost all his primary job responsibilities and started to phase him out as a

5  manager in an effort to force his resignation.

6  According to plaintiff, Hoffman was "no longer consulted on quarterly and annual

7  guidance provided to analysts for revenue forecasts and sale professional hiring plans,

8  which were his responsibility prior to August 2005."  In addition, "FoxHollow discussed

9  reducing sales compensation levels to the sales team, again bypassing Hoffman," and

10  "Hoffman was no longer invited to market analysis meetings, which he presided over

11  before."  On January 11, 2006, Hoffman "angrily" submitted his letter of resignation.  FAC

12  ¶ 89.

13  Similarly, based on information obtained from Executive Employee Witness 1, as of

14  December 10, 2005, Martin "was demoted by Simpson and the Board to a nominal position

15  on a four-person 'leadership committee' along with Ferguson, Rohlen and Ron Steckel, and

16  was stripped of substantive authority at the Company."  Plaintiff asserts that Martin was

17  suddenly "subject to accusations of wrongdoing by Board members, such as Sandy Fitch

18  and Myrtle Potter, who had barely even spoken to Martin before."  FAC ¶ 90.

19  On January 9, 2006, FoxHollow filed a Form 8-K and issued a press release,

20  announcing its preliminary financial results for 4Q05 and the full FY05, as well as providing

21  guidance for the new fiscal year.  The Form 8-K indicated that previous forecasts of

22  revenue remained on course, but did not mention any management "transition."  FAC ¶ 91.

23  In the press release, Simpson was quoted as saying,

24  Our tremendous growth in 2005 and growth outlook for 2006 is based on our
   success in driving adoption from existing customers, as well as the significant
25  increase of our customer base.  Revenues for 2005 more than tripled from
   2004.  Our outlook for 2006 represents a more than 60 percent growth in

26

27  _____

   [7]   The transcript of the December 12, 2005, conference call does not reflect that
28  Simpson stated that no further management changes were contemplated, but rather that he
   simply referred to the existing management team as "strong."

United States District Court
For the Northern District of California

1    year-over-year revenue.

2    FAC ¶ 91.

3    In a related conference call on the same date, Simpson reported that the Company

4    had retained a search firm to assist with the search for a new chief executive officer.

5    "While looking forward to the completion of the search process, we are confident in the

6    abilities of the senior management team already in place."  FAC ¶ 92.

7    On Thursday, January 26, 2006, the final day of the proposed class period,

8    FoxHollow filed a Form 8-K and issued a press release, announcing that Martin was being

9    replaced as Chief Operating Officer and Hoffman was being replaced as Vice-President of

10   Sales.  Rohlen was promoted to Vice President of Strategic Operations, and Ferguson

11   remained as Chief Financial Officer.  Simpson explained, "Based on the new strategic

12   initiatives we announced earlier this month, it is appropriate to effect this transition at this

13   time."  FAC ¶ 94.

14   Also on January 26, 2006, analysts at Piper Jaffray released a report concerning

15   FoxHollow entitled, "Something Seems Amiss."  The report stated,

16
17       We recently upgraded [FoxHollow] on valuation, after its 33% decline due to
         the uncertainty of 2006 revenues and the sudden resignation of its CEO.  We
         are now inserting some caution on our short-term views.  We have new
18       worries related to additional management shakeups, possibly the VP of Sales
         and/or the COO.  In our opinion, while neither would be a big loss
19       fundamentally, we are left wondering why the news flow from [FoxHollow] is
         so uneven and what the underlying cause is for the potential management
20       disruption.

21       We have been tracking down rumors . . . of management departures.  We
         have not been able to confirm the rumors, but we are concerned by the lack
22       of denial by management.  In our opinion, true or not, the rumors are gaining
         enough substance to engender comment from the company.
23
         The uncertainty of "what's really wrong" can only be partially balanced by our
24       channel checks that indicate a strong market for [FoxHollow's] products in
         2006.  We cannot assure investors that all is right inside the company; in our
25       opinion, risk has increased.

26   FAC ¶ 95.

27   Plaintiff alleges that on this news, FoxHollow's share price fell 7%, the next day,

28   January 27, 2006, and fell about 15% within three days, reaching a new yearly low of

16

1   $23.35.  FAC ¶ 96.

2       Plaintiff asserts that "after public revelation of FoxHollow's management 'transition'"

3   – which plaintiff terms "the result of Simpson's undisclosed 'edict' to Company

4   management to either agree to acquire LuMend or be terminated" – plaintiff and the

5   members of the proposed class lost 50% of the value of their stock in just over one month.

6   Plaintiff asserts that FoxHollow's stock never recovered from the revelation of this material

7   misinformation, and continued trading at $25 per share despite record reported revenues.

8   FAC ¶ 97.  Plaintiff claims that FoxHollow announced at some unspecified "later" time that

9   Simpson was changing his title from "interim" CEO to "permanent" CEO,[8] and that on the

10  news that Simpson was remaining as CEO, the price of the stock dropped 10%.  FAC ¶ 98.

11      The first complaint in the present action was filed on July 28, 2006.  On October 26,

12  2006, pursuant to stipulation, the court appointed Margaret Kovarik and Matthew Roberts

13  to serve as co-lead plaintiffs.  Plaintiffs filed the consolidated amended complaint ("CAC")

14  on December 15, 2006, asserting claims under § 10(b) of the Exchange Act, and SEC Rule

15  10b-5, against Simpson, Ferguson, and FoxHollow, and also alleging a claim of control-

16  person liability against Simpson and Ferguson.

17      On September 5, 2007, the court granted defendants' motion to dismiss the CAC,

18  finding it "deficient in both scienter and falsity."  The dismissal was with leave to amend.

19  The FAC was filed on October 19, 2007, by lead plaintiff Matthew Roberts.

**DISCUSSION**

21  A.   Legal Standard

22      A motion to dismiss under Rule 12(b)(6) tests for the legal sufficiency of the claims

23  alleged in the complaint.  Ileto v. Glock, Inc., 349 F.3d 1191, 1199-1200 (9th Cir. 2003).

24  Although its review is generally limited to the contents of the complaint, the Court may

25  consider documents referenced extensively in the complaint and documents that form the

26

27      [8]  Simpson was named "interim" or "acting" CEO upon Thomas' departure from the
28  Company.  FoxHollow's public filings indicate that the Board subsequently voted to make
    Simpson the permanent CEO.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1   basis of a plaintiff's claim.  United States v. Ritchie, 342 F.3d 903, 908-09 (9th Cir. 2003);

2   see also No. 84 Employer-Teamster Joint Counsel Pension Trust Fund v. America West

3   Holding Corp., 320 F.3d 920, 925 n.2 (9th Cir. 2003).

4          To survive a motion to dismiss for failure to state a claim, a complaint generally must

5   satisfy the minimal notice pleading requirements of Federal Rule of Civil Procedure 8,

6   which requires that the complaint include a "short and plain statement of the claim showing

7   that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Specific facts are unnecessary

8   – the statement need only give the defendant "fair notice of the claim and the grounds upon

9   which it rests."  Erickson v. Pardus, 127 S.Ct. 2197, 2200 (2007) (citing Bell Atlantic Corp.

10   v. Twombly, 127 S.Ct. 1955, 1964-65 (2007)).

11          The court "must accept as true all of the factual allegations contained in the

12   complaint," id. at 2200, but need not accept as true allegations that are legal conclusions,

13   unwarranted deductions of fact or unreasonable inferences, see Sprewell v. Golden State

14   Warriors, 266 F.3d 979, 988, amended, 275 F.3d 1187 (9th Cir.2001).  A plaintiff's

15   obligation to provide the grounds of his entitlement to relief "requires more than labels and

16   conclusions, and a formulaic recitation of the elements of a cause of action will not do."

17   Bell Atlantic, 127 S.Ct. at 1964-65 (citations and quotations omitted).  Rather, the

18   allegations in the complaint "must be enough to raise a right to relief above the speculative

19   level."  Id. at 1965.  A motion to dismiss should be granted if the complaint fails to proffer

20   enough facts to state a claim to relief that is plausible on its face.  See id. at 1974.

21          Where a complaint includes allegations of fraud, however, Federal Rule of Civil

22   Procedure 9(b) requires that falsity be pled with more specificity, including an account of

23   the "time, place, and specific content of the false representations as well as the identities of

24   the parties to the misrepresentations."  Swartz v. KPMG LLP, 476 F.3d 756, 764 (9th Cir.

25   2007) (citations omitted).  "[A]llegations of fraud must be specific enough to give

26   defendants notice of the particular misconduct which is alleged to constitute the fraud

27   charged so that they can defend against the charge and not just deny that they have done

28   anything wrong."  Bly-Magee v. California, 236 F.3d 1014, 1019 (9th Cir. 2001) (citation and

1   quotations omitted).  In addition, the plaintiff must do more than simply allege the neutral

2   facts necessary to identify the transaction; he must also explain why the disputed statement

3   was untrue or misleading at the time it was made.  Yourish v. California Amplifier, 191 F.3d

4   983, 992-93 (9th Cir. 1999).

5        In dismissing for failure to state a claim, "a district court should grant leave to amend

6   even if no request to amend the pleadings was made, unless it determines that the

7   pleading could not possibly be cured by the allegation of other facts."  Doe v. United States,

8   58 F.3d 494, 497 (9th Cir. 1995) (citations omitted); see also Swartz, 476 F.3d at 765;

9   Eminence Capital, LLC v. Aspeon, Inc., 316 F.3d 1048, 1052 (9th Cir. 2003).

10  B.    Defendants' Motion to Dismiss

11       Defendants contend that the FAC differs very little, if at all, from the CAC.  They

12  assert that the FAC fails to allege, with specificity, any false or misleading statements or

13  omissions; and that the FAC fails to plead particularized facts giving rise to a strong

14  inference that defendants acted with the required state of mind.  Defendants also contend

15  that the FAC fails to plead a claim of control-person liability, because it fails to allege a

16  primary violation.

17       Section 10(b) of the Securities Exchange Act provides, in part, that it is unlawful "to

18  use or employ in connection with the purchase or sale of any security registered on a

19  national securities exchange or any security not so registered, any manipulative or

20  deceptive device or contrivance in contravention of such rules and regulations as the [SEC]

21  may prescribe."  15 U.S.C. § 78j(b).

22       SEC Rule 10b-5, promulgated under the authority of § 10(b), makes it unlawful for

23  any person to use interstate commerce

24       (a)    To employ any device, scheme, or artifice to defraud,

25       (b)    To make any untrue statement of a material fact or to omit to state a
26  material fact necessary in order to make the statements made, in the light of
    the circumstances under which they were made, not misleading, or

27       (c)    To engage in any act, practice, or course of business which operates
    or would operate as a fraud or deceit upon any person, in connection with the
28  purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To plead securities fraud under § 10(b) of the 1934 Exchange Act, plaintiffs must allege (1) a misstatement or omission (2) of material fact ( 3) made with scienter (4) on which plaintiffs relied (5) which proximately caused the plaintiffs' injury.  <u>DSAM Global Value Fund v. Altris Software, Inc.</u>, 288 F.3d 385, 388 (9th Cir. 2002).  Similarly, the elements of a Rule 10b-5 claim are (1) a material misrepresentation (2) made with scienter (3) in connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss.  <u>In re Daou Sys., Inc. Sec. Litig.</u>, 411 F.3d 1006, 1014 (9th Cir. 2005).

This case is controlled by the provisions of the Private Securities Litigation Reform Act ("PSLRA"), which was enacted by Congress in 1995 to establish uniform and stringent pleading requirements for securities fraud actions, and to put an end to the practice of pleading "fraud by hindsight."  <u>In re Silicon Graphics, Inc. Sec. Litig.</u>, 183 F.3d 970, 958 (9th Cir. 1999).  The PSLRA heightened the pleading requirements in private securities fraud litigation by requiring that the complaint plead both falsity and scienter with particularity.  <u>In re Vantive Corp. Sec. Litig.</u>, 283 F.3d 1079, 1084 (9th Cir. 2002); <u>see also</u> <u>In re Daou</u>, 411 F.3d at 1014.  If the complaint does not satisfy these pleading requirements, the court, upon motion of the defendant, must dismiss the complaint.  15 U.S.C. § 78u-4(b)(3)(A).

Under § 20(a) of the Exchange Act, joint and several liability can be imposed on persons who directly or indirectly control a violator of the securities laws.  15 U.S.C. § 78t(a).  Plaintiffs alleging a claim that individual defendants are "controlling persons" of a company must allege a primary violation under the 1934 Exchange Act, and must also allege that the defendant exercised actual power or control over the primary violator. <u>America West</u>, 320 F.3d at 945; <u>see also</u> <u>Howard v. Everex Sys., Inc.</u>, 228 F. 3d 1057, 1065 (9th Cir. 2000).

1.     False or misleading statements or omissions

At  the hearing on the previous motion to dismiss, plaintiff's counsel indicated that

United States District Court

For the Northern District of California

the CAC alleged fraudulent omissions – primarily that FoxHollow mislead investors by failing to disclose Simpson's "edict" to management – rather than false statements.  The claims in the FAC are premised on the same theory, alleging, not that defendants' public statements were false, but that statements in public filings, in press releases, and in conference calls created an impression that the Company was doing well and had top-rate management, when in fact, relations among the executives were less than congenial, and Simpson was attempting to impose his will on the Company.  Defendants argue that the FAC should be dismissed because plaintiff has not adequately alleged any actionable false or misleading statements or omissions.

Under the PSLRA – whether alleging that a defendant "made an untrue statement of a material fact" or alleging that a defendant "omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading" – the complaint must specify each statement alleged to have been false or misleading, specify the reason or reasons why each such statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, state with particularity all facts on which that belief is formed.  15 U.S.C. § 78u-4(b)(1).  "[V]ague claims about what statements were false or misleading [and] how they were false" are subject to dismissal.  Falkowski v. Imation Corp., 309 F.3d 1123, 1133 (9th Cir. 2002).

Defendants assert that plaintiff fails to satisfy these requirements, as he does not specify exactly which statements were misleading, and offers only vague assertions as to why FoxHollow's failure to disclose Simpson's alleged "edict" was misleading.  Defendants contend that none of the pre-class-period statements cited by plaintiff created a duty to disclose the departures of Thomas, Martin, or Hoffman from FoxHollow prior to the time that defendants did in fact disclose the departures.[9]

---

[9] Defendants raise two additional issues, neither of which the court decides here.  They contend that plaintiff has identified no actionable statements or omissions that are both within the class period and prior to plaintiff's last purchase of stock, on December 6, 2005.  They also assert that plaintiff has at best stated a claim for mismanagement or breach of fiduciary duty, which, under Santa Fe Industries, Inc. v. Green, 430 U.S. 462 (1977), is not actionable as a federal securities cause of action.

United States District Court

For the Northern District of California

In opposition, plaintiff argues that defendants had a duty to disclose all material information regarding the retention of management, in view of the "false state of affairs publicly portrayed." Plaintiff claims that because defendants chose to speak about the "positive aspects" of FoxHollow's management, they were obligated to disclose the negative aspects as well.

　　　　　　　a.　　Pre-class period statements

Defendants argue that the pre-class period statements cited by plaintiff did not create a duty to report on any subsequent management discord or disharmony, or to disclose Simpson's alleged "edict" to management, as the securities laws do not impose an ongoing duty to update prior disclosures to make them complete.[10]

Plaintiffs allege that the statements cited from the April 27 and July 27, 2005 conference calls; the statements cited from the Form 10-K for 2004, and the Form 10-Qs for 1Q05 and 2Q05; and the statements cited from the April 29, 2005 Proxy Statement were misleading because "the public market and industry analysts were uniformly led to believe that FoxHollow's Board was entirely satisfied with the performance of its executive team, including Thomas . . . " FAC ¶ 64. Plaintiff claims that this public perception was mistaken "[b]eginning in August 2005." Id.

The statements cited from the April 27, 2005 conference call, are the following, made by Thomas:

●　　"We are executing on our plan by growing our sales force, increasing capacity and implementing effective marketing and sales programs."

●　　"At the same time, we are running the company to ensure that we achieve managed growth and drive the company toward profitability."

●　　"As a result, we believe our story will only get better in the months and years

---

[10] Defendants also argue that the pre-class period statements are not actionable.  In general, liability in a securities class action lawsuit cannot attach to statements made either before or after the class period.  See In re Seagate Tech. II Sec. Litig., 1995 WL 66841 at *4 (N.D. Cal., Feb. 8, 1995).  Nevertheless, the court has addressed defendants' other arguments regarding the pre-class period statements because those arguments extend to the class-period statements as well.

United States District Court

For the Northern District of California

ahead."

● "The challenge we face is not one of creating a market, but rather executing on the opportunities in front of us."

● "We believe we have the resources, technology, people, and financials to realize our goals not only with our core business but in other exciting areas as well."

The statements cited from the July 27, 2005 conference call are the following, made by Thomas:

● "An important piece of the FoxHollow infrastructure story is our people."

● "We are continuing to add to our bench strength with the addition of management personnel in all areas of the Company."

● "I want to take this opportunity to acknowledge the tremendous efforts of all our employees throughout the organization, including operations, R&D, sales, marketing, IT, the critical and regulatory department, and our finance and administrative groups."

The statements cited from the 2004 Form 10-K are the following:

● "We believe that our future success will depend on our continued ability to attract, hire and retain qualified personnel."

● "[W]e believe our employee relations are good."

The statements cited from the 10-Qs appear under "Factors Affecting Future Operating Results," and include the following:

● "Our success largely depends on the skills, experience and efforts of our officers and other key employees."

● "The loss of any of our senior management team could harm our business."[11]

The statements cited from the April 29, 2005 Proxy Statement are statements from the "Report of the Compensation Committee," detailing the compensation program for executive officers, and include the following:

● "The Compensation Committee's overall executive compensation philosophy

---

[11] Similar statements appear in the discussion of risk factors in the 2004 Form 10-K.

United States District Court

For the Northern District of California

is to . . . [p]rovide competitive levels of total compensation to attract and retain executives who are critical to FoxHollow's long-term success."

● "The major components of executive compensation are base salary, cash bonus, and potential long-term compensation through stock options."

● "In December 2004, the Compensation Committee met and approved a bonus plan for the Chief Executive Officer [Thomas], Chief Operating Officer [Martin] and Chief Financial Officer [Ferguson]."

● "Stock options are granted to FoxHollow's executive officers and other employees both as a reward for past individual and corporate performance and as an incentive for future performance" (under heading "Long Term Incentives").

Plaintiff asserts that as of August 28, 2005 – the date that Simpson allegedly told Thomas that the LuMend acquisition would go forward, with or without the executive officers' approval; that the decision was final and non-negotiable; and that executive team members would be asked to resign if they refused to go along with the LuMend acquisition – the above statements became misleading and that defendants had a duty to disclose to the public market that Simpson had ordered executive management to "breach their fiduciary duty or else risk termination." FAC ¶ 72.

To be actionable, a statement must be misleading. "Silence, absent a duty to disclose, is not misleading under Rule 10b-5." Basic v. Levinson, 485 U.S. at 239 n.17. There is no obligation to disclose information that is not material. Id. at 238. There is no obligation to disclose even material information simply because it exists. See Chiarella v. United States, 445 U.S. 222, 235 (1980) (duty to disclose does not arise from mere possession of nonpublic market information). If a challenged statement is not false or misleading, it does not become actionable merely because it is incomplete. In re Vantive, 283 F.3d at 1085; Brody v. Transitional Hosp. Corp., 280 F.3d 997, 1006 (9th Cir. 2002).

In general, issuers of securities are required to disclose material facts as mandated by SEC regulations, which do not impose a "continuous disclosure requirement," see Gallagher v. Abbott Labs, 269 F.3d 806, 808-09 (7th Cir. 2001), or when they are trading in

24

United States District Court

For the Northern District of California

1    their own securities, see McCormick v. Fund American Cos., 26 F.3d 869, 875-76 (9th Cir.

2    1994).

3        Apart from that, a duty to disclose generally arises only where necessary to correct a

4    prior statement that remains viable in the market and which, "at the time made, the

5    company believed to be true, but as revealed by subsequently discovered information

6    actually was not." In re Verity, Inc. Sec. Litig., 2000 WL 1175580 at *4 (N.D. Cal., Aug. 11,

7    2000) (quoting Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1431 (3rd Cir. 1997)).

8    This duty is otherwise known as the "duty to correct." Id.; see also Stransky v. Cummins

9    Engine Co., 51 F.3d 1329, 1331 (7th Cir. 1995)).

10       In the present case, plaintiff does not allege that defendants made any statement

11   that remained viable in the market and which was inaccurate at the time it was made, such

12   that a duty to correct would arise.  In particular, plaintiff does not allege that defendants

13   made any statements regarding the long-term employment of any specific individual at

14   FoxHollow; in fact, the Company repeatedly stated in public filings that employment at

15   FoxHollow was "at will."

16       Rather than a duty to correct, plaintiff appears to be asserting a "duty to update."

17   The duty to update "concerns statements that although reasonable at the time made,

18   become misleading when viewed in the context of subsequent events." In re Verity, 2000

19   WL 1175580 at *5 (quoting Burlington Coat, 114 F.3d at 1431).  Plaintiff contends that

20   defendants' pre-class period statements became misleading at the point that Simpson

21   allegedly issued his "edict" to Thomas, and that defendants were therefore required to

22   disclose the existence of the discord among the FoxHollow executives.

23       Courts (which do not include the Ninth Circuit) that have recognized the "duty to

24   update" theory have also indicated that there is no duty to update vague statements of

25   optimism or expressions of opinion, and no need to update when the original statement

26   was not forward-looking and does not contain some factual representation that remains

27   "alive" in the minds of investors as a continuing representation, or if the original statements

28   are for some other reason not material.  See, e.g., In re Int'l Bus. Machines Corporate Sec.

United States District Court

For the Northern District of California

1   *Litig.* 163 F.3d 102, 110 (2nd Cir. 1998).

2       Here, defendants argue that the pre-class period statements in the conference calls

3   and public filings were either vague statements of corporate optimism, or were forward-

4   looking statements protected by the PSLRA's safe-harbor provision, and thus created no

5   duty to update.  As for the statements in the Proxy Statement regarding executive

6   compensation, defendants contend that those were simply part of a larger statement of

7   FoxHollow's general employment and compensation policy, not a statement to investors

8   that FoxHollow intended to retain any particular employee for the long term.

9                    i.      Statements of corporate optimism

10      Defendants assert that the cited statements regarding FoxHollow's workforce were

11  largely vague statements of corporate optimism.  In general, vague and unspecific

12  assertions of corporate optimism or statements of mere puffing cannot state an actionable

13  claim of fraud.  See Glen Holly Entm't, Inc. v. Tektronix, Inc., 352 F.3d 367, 379 (9th Cir.

14  2003).  Such statements are typically not actionable under federal securities laws because

15  "they are considered immaterial and discounted by the market" and because "reasonable

16  investors do not consider 'soft' statements or loose predictions important in making

17  investment decisions."  In re Copper Mountain Sec. Litig., 311 F.Supp. 2d 857, 868 (N.D.

18  Cal. 2004) (citing Wenger v. Lumisys, Inc., 2 F.Supp. 2d 1231, 1245 (N.D. Cal. 1998)); see

19  also In re Leapfrog Enters., Inc. Sec. Litig., 527 F.Supp. 2d 1033, 1049-51 (N.D. Cal.

20  2007); In re Wet Seal, Inc. Sec. Litig., 518 F.Supp. 2d 1148, 1168-69 (C.D. Cal. 2007).

21      The court finds that statements such as "[W]e believe our story will only get better in

22  the months and years ahead," and "We believe we have the resources, technology, people

23  and financial to realize our goals not only with our core business but in other exciting areas

24  as well," and "An important piece of the FoxHollow infrastructure is our people," and "I want

25  to take the opportunity to acknowledge the tremendous efforts of all our employees

26  throughout the organization, including operations, R&D, sales, marketing, IT, the critical

27  and regulatory department, and our finance and administrative groups," are soft statements

28  or loose predictions that do not give rise to a securities fraud cause of action.

United States District Court

For the Northern District of California

1    These vague and highly general statements did not mention any employee by name,

2    and there is nothing in the cited excerpts that is sufficiently specific to have created an

3    "impression" that became false upon Simpson's alleged threat to purge senior management

4    if the LuMend deal did not go through.  No rational investor would conclude from such

5    statements of corporate optimism as those quoted by plaintiff that FoxHollow intended to

6    retain Thomas, Martin, and Hoffman for the long term.

7    Nor, in general, would the risk disclosure statements cited by plaintiff have

8    reasonably led anyone to conclude that FoxHollow intended to retain management.

9    Instead, the statements convey the opposite impression – that FoxHollow's management

10   was subject to change, that personnel might be replaced, and that investors should be

11   aware of that possibility.

12                    ii.    Forward-looking statements

13   Defendants argue that to the extent that the cited statements in the April 27 and

14   June 27, 2005 conference calls and in the SEC filings in March-July 2005 can be

15   considered anything other than vague statements of corporate optimism, they are forward-

16   looking statements that are protected under the PSLRA's safe-harbor provision.

17   The PSLRA carves out a safe harbor for forward-looking statements that prove false

18   if the statement "is identified as a forward-looking statement and is accompanied by

19   meaningful cautionary statements identifying important factors that could cause results to

20   differ materially from those in the forward-looking statements."  15 U.S.C. § 78u-

21   5(c)(1)(A)(i).

22   Forward-looking statements include statements containing a projection of revenues,

23   income, or earnings per share; management's plans or objectives for future operations; or

24   a prediction of future economic performance – as well as any statement of the assumptions

25   underlying or relating to those sorts of statements.  15 U.S.C. § 78u-5(i)(1)(A)-(D).

26   Statements concerning historical or current facts are not forward-looking.  In re Applied

27   Signal Tech., Inc. Sec. Litig., 2006 WL 1050174 at *13 (N.D. Cal., Feb. 8, 2006).  Nor is

28   there any duty to update forward-looking statements.  See 15 U.S.C. § 78u-5(d) ("Nothing

United States District Court
For the Northern District of California

1    in this section shall impose a duty to update a forward-looking statement.")

2        Here, to the extent that any of the pre-class period statements are sufficiently

3    specific that they cannot properly be considered vague statements of corporate optimism,

4    the court finds that they are forward-looking statements protected by the safe-harbor

5    provision.

6        Plaintiff claims that statements such as "[w]e believe we have the resources,

7    technology, people, and financial to realize our goals," "[o]ur success largely depends on

8    the skills, experience and efforts of our officers and other key employees," and "[t]he loss of

9    any of our senior management team could harm our business," as well as references to

10   "the tremendous efforts of all our employees throughout the organization," created an

11   impression that the Company planned to retain its senior executives for the long term.

12       These statements, as plaintiff cites them in the context of the FAC, are all forward-

13   looking statements because plaintiff claims that they suggested or implied that the

14   Company would retain its executives in the future.  Because the statements were

15   accompanied by "meaningful cautionary statements identifying important factors that could

16   cause results to differ materially from those in the forward-looking statements," they are

17   protected under the PSLRA's safe-harbor provision.

18       FoxHollow stated in the Form 10-K for fiscal year 2004 and in its quarterly filings for

19   2005 that "[f]orward-looking statements are inherently subject to risks and uncertainties,

20   some of which cannot be predicted or quantified," and explained that the risks included

21   those listed under "Factors Affecting Future Operating Results."  The Company indicated

22   that in some cases, forward-looking statements could be identified by terminology such as

23   "may," "will," "should," "could," "expect," "plan," "anticipate," "believe," "estimate," "predict,"

24   "intend," "potential," [or] "continue," adding that [t[hese statements are only predictions.

25   Actual events or results may differ materially."  Those cautionary statements were

26   incorporated by reference in the conference calls.

27       With specific regard to employment and retention of employees at FoxHollow,

28   FoxHollow cautioned, as early as the August 27, 2004 Registration Statement and

United States District Court

For the Northern District of California

Prospectus, that the Company's success "largely depends on the skills, experience and efforts" of its officers and key employees.

> Any of our officers and other key employees may terminate their employment at any time. The loss of any of our senior management team could harm our business. Our ability to retain our skilled labor force and our success in attracting and hiring new skilled employees will be a critical factor in determining whether we will be successful in the future. We may not be able to meet our future hiring needs or retain existing personnel. We will face particularly significant challenges and risks in hiring, training, managing and retaining engineering and sales and marketing employees. Failure to attract and retain personnel, particularly technical and sales and marketing personnel, would harm our ability to compete effectively and grow our business. The announcement of the loss of one of our key employees could negatively affect our stock price.

Similarly, the Company's emphasis in the "Factors Affecting Future Operating Results" in the quarterly filings was on the fact that one of the variables that "could negatively affect the stock price" in the future was any potential "announcement of the loss of one of our key employees," which was a possibility given that "[w]e may not be able to . . . retain existing personnel," and that "[a]ny of our officers and other key employees may terminate their employment at any time."

Plaintiff argues that FoxHollow's cautionary statements should be viewed as "boilerplate," not sufficiently substantive and not tailored to the Company's specific future projections, estimates, or opinions.  That argument is without merit in the present case, as the statements that plaintiff claims publicly communicated FoxHollow's intention to retain Thomas, Martin, and Hoffman actually did no such thing.  And to the extent that any such statement did create any future expectation, the Company's risk disclosures were more than adequate to create a safe harbor under the PSLRA.

### iii.    Statements of compensation policy

Finally, as to the statements in the April 29, 2005 Proxy Statement, defendants argue that the "overall executive compensation philosophy" to "attract and retain executives who are critical to FoxHollow's long-term success" was simply a statement of FoxHollow's general policy, and not a clear statement to investors that FoxHollow intended to retain any particular employee for the long term.  Indeed, defendants note, the Proxy Statement

United States District Court

For the Northern District of California

1   clearly stated that "[e]mployment at our company is at will."

2       Defendants also argue that the Proxy Statement's discussion of stock options, and

3   the reference to certain options as "long-term compensation," was not an indicator that

4   FoxHollow intended to retain Thomas, Martin, and Hoffman for the long term.  Defendants

5   assert that FoxHollow was required by the SEC during that period to report stock options as

6   "long-term compensation," as it did.

7       In response, plaintiff does not contend that the disclosures in the Proxy Statement

8   were false.  Instead, he claims that the disclosures created an ongoing duty to report the

9   possibility that certain executives might be fired or depart the Company, and that because

10   the Proxy Statement reported the option grants as "long term" compensation, FoxHollow

11   had in effect represented to investors that this compensation would "insure" the long-term

12   employment of its managerial workforce.

13       The court finds that the statements regarding FoxHollow's compensation policy were

14   far too general to have created a clear impression that the Company intended to retain any

15   specific employee for a stated period of time.[12]  The Proxy Statement did not guarantee or

16   even suggest that any particular employee would be employed at FoxHollow for the long

17   term, and did not represent that option grants were issued to specific employees to induce

18   those employees to remain at the Company for a stated period of time.  It is not reasonable

19   to conclude that FoxHollow's compensation disclosures gave "a clear indicator to the public

20   market that FoxHollow wanted to retain Thomas, Martin, and Hoffman for a long term" as

21   plaintiff claims.

22       FoxHollow accurately reported executive compensation, as required under SEC

23   regulations, which included the requirement that certain stock options be reported as "long-

24   term compensation."  It was not FoxHollow's choice to describe the option grants as "long-

25   term compensation," and the use of that language in the public statements indicates

26   nothing about defendants' intention with regard to FoxHollow's employees.  Furthermore,

27

28          [12]  The fact that the stock options had a 10-year term is similarly unremarkable.

United States District Court
For the Northern District of California

1  the Proxy Statement reported this "long-term compensation" as "potential," and clearly

2  stated, "Employment at our company is at will," and that any of FoxHollow's employees

3  could lose their employment at any time.  No reasonable investor would interpret these

4  compensation disclosures as a guarantee that FoxHollow would retain certain, specified

5  executives for the long term.

6          b.      Class-period statements

7          Plaintiff alleges that defendants made misleading statements in the October 26,

8  2005 conference call; in the Form 8-K filed on December 12, 2005, and in the conference

9  call of that same date; and in the January 9, 2006 Form 8-K, and accompanying press

10  release and conference call.

11          Plaintiff asserts that the following statements made by Thomas during the October

12  26, 2005 conference call were misleading:

13  ●      "We'd also like to thank and congratulate all the members of the FoxHollow

14  team for their efforts and results."

15  ●      "The performance over the past 2 years is nothing short of remarkable and

16  we are all energized by the new Hawks that are coming in with the mindset of taking this

17  opportunity to the next level."

18  ●      "[The team has just done remarkable things here with regard to this last

19  quarter and if you look back over the past two years, what we've done for revenue growth,

20  gross margin growth and now our first profitable quarter,] we couldn't be happier."

21          Plaintiff claims that these statements were misleading because defendants did not

22  reveal the internal management disputes regarding Simpson's "edict" concerning the

23  LuMend acquisition, and did not disclose Simpson's alleged plan to fire Thomas, Martin,

24  and Hoffman.  Plaintiff also asserts that the Form 8-K filed on October 26, 2005 did not

25  mention Simpson's decision to terminate FoxHollow's executive management, but does not

26  specifically claim that the 8-K was misleading.

27          Plaintiff alleges further that the Form 8-K filed on December 12, 2005, and the press

28  release issued on the same date were misleading because Thomas did not "retire" or leave

31

United States District Court

For the Northern District of California

the company voluntarily, but rather was "fired" or was forced to resign; and also because Simpson did not intend on "leading" the Company's present senior management, and did not view them as "outstanding."

Plaintiff also cites various snippets from the December 12, 2005 conference call, and asserts that those statements were misleading, including the following:

● "We feel confident, based on our success and the strong management team we have in place, that there will be no shortage of interested, highly-qualified candidates interested in [the position as President and CEO]."  (Statement by Simpson).

● "[Thomas] leaves us in very good shape with a strong management team . . . ." (Statement by Simpson).

● "We also feel like the management team here is incredible."  (Statement by Thomas).

● Various statements by Thomas emphasizing that he was leaving FoxHollow "for personal reasons" – to spend more time with his family, to "take a step back," to "reconnect with family and friends."

Finally, plaintiff refers to the January 9, 2006, Form 8-K, which indicated that previous forecasts of revenue remained on course, but did not mention any management "transition."  Plaintiff cites the following statements from the press release that accompanied the Form 8-K:

● "Our tremendous growth in 2005 and growth outlook for 2006 is based on our success in driving adoption from existing customers, as well as the significant increase of our customer base."

● "Revenues for 2005 more than tripled from 2004."

● "Our outlook for 2006 represents a more than 60 per cent growth in year-over-year revenue."

Plaintiff also cites the following statement made by Simpson at a related conference call on the same date, with reference to the search for a new CEO:

● "While looking forward to the completion of the search process, we are

32

1    confident in the abilities of the senior management team already in place."

2          Plaintiff asserts that the statements cited above were misleading – particularly the

3    references to the "strong management team" in the December 12, 2005 conference call –

4    because Simpson did not believe FoxHollow had a "strong management team," and in fact

5    planned to replace Martin and Hoffman within a few weeks.

6          Defendants argue that under Brody, they were under no obligation to disclose that

7    certain executives were leaving FoxHollow before the dates of the actual departures,

8    because they had never stated publicly that those individuals would not be leaving the

9    Company.

10          In Brody, the Ninth Circuit considered whether the plaintiffs had adequately alleged

11    that statements made by the defendants in two press releases were misleading.   The

12    defendant THC had announced a plan to buy back $25 million worth of shares from

13    stockholders.  A third party subsequently made a written offer to purchase THC at a greater

14    price per share.  A month later, THC issued a press release describing the progress and

15    extent of its stock repurchase program, but did not mention the third-party's purchase offer

16    or any other company's interest in purchasing THC.

17          The plaintiffs argued that in order for a statement not to be misleading, once a

18    disclosure is made, there is a duty to make it complete and accurate.  The Ninth Circuit

19    responded that "[t]his proposition has no support in the case law," and held that the

20    securities laws prohibit "only misleading and untrue statements, not statements that are

21    incomplete."  Brody, 280 F.3d at 1006.  The court added, "To be actionable under the

22    securities laws, an omission must be misleading; in other words, it must affirmatively create

23    an impression of a state of affairs that differs in a material way from the one that actually

24    exists."  Id.

25          The Ninth Circuit found that the public was not misled by THC's failure to disclose

26    the purchase offer because THC never conveyed to the public that a merger or acquisition

27    would not occur.  Id. at 1006-07.  The court observed that if the press release had

28    affirmatively intimated that no merger was imminent, "it may well have been misleading,"

United States District Court

For the Northern District of California

1   but the actual press release neither stated nor implied anything about a merger.  Id.

2          The plaintiffs also claimed that a second press release was misleading because it

3   stated that the company had received "expressions of interest" from potential acquirers,

4   when in fact it had received actual proposals from three different parties.  The court noted

5   that a "proposal" is an "expression of interest," and found that the press release had

6   included sufficient information to communicate that these expressions of interest were more

7   than preliminary inquiries.  More importantly, the court found that the press release did not

8   give the impression that the company had not received actual proposals from three parties,

9   or otherwise mislead readers about the stage of the negotiations.  Id.

10          Similarly, in the present case, defendants never stated publicly that Thomas, Martin,

11   Hoffman, or any particular employee would not be leaving the Company in the foreseeable

12   future.  FoxHollow's public filings plainly disclosed that all employment at FoxHollow was

13   "at will," and that one of the "Factors Affecting Future Operating Results" was the possibility

14   that FoxHollow might lose some of its senior executives.

15          The public statements acknowledging the efforts of FoxHollow's employees, and

16   emphasizing that "people" were an important piece of FoxHollow's infrastructure, did not

17   mislead investors into believing that any specific employee would work at FoxHollow in

18   perpetuity, because defendants never indicated that any specific employee was essential to

19   FoxHollow's continued operation or profitability.  Thus, defendants did not have a duty to

20   disclose the hypothetical possibility that some of the senior executives might at some point

21   be leaving the Company, before such an event had occurred.

22          Moreover, a publicly-traded company is not obligated to disclose every detail of its

23   internal financial plans or business strategy.  See Heliotrope General, Inc. v. Ford Motor

24   Co., 189 F.3d 971, 980 (9th Cir. 1999) (defendants had no duty to disclose internal financial

25   projections regarding the expected dollar values of tax costs and benefits, the date on

26   which the tax-strategy benefits were expected to be outweighed by its costs, or the date on

27   which a merger was most likely); Hanon v. Dataproducts Corp., 976 F.2d 497, 504 (9th Cir.

28   1992) (no disclosure required when event is contingent or speculative in nature); In re

United States District Court

For the Northern District of California

Convergent Techs. Sec. Litig., 948 F.2d 507, 516 (9th Cir. 1991) (no duty to disclose internal projections or progress in implementing new mechanization structure)).

Here, the determination whether FoxHollow should acquire LuMend was part of the Company's internal business strategy, as was the decision whether to retain any particular at-will employee.  Defendants were not required to disclose the details of those internal discussions because such disclosure was not necessary to correct a prior false statement.

Plaintiff submits that Brody is not applicable, and argues that the facts of the present case are similar to the facts in New Jersey v. Sprint Corp., 2004 WL 1960130 (D. Kan., Sept. 3, 2004).  In that case, two Sprint executives – William Esrey (Chairman and Chief Executive Officer) and Ronald LeMay (President and Chief Operations Officer) – received stock options, some of which they exercised in 1999 and 2000.  In an attempt to avoid paying taxes on their aggregate taxable gain of $287 million, Esrey and LeMay purchased certain tax shelters from Ernst & Young.

In September 2000, the Internal Revenue Service issued a notice indicating its view that tax shelters similar to the ones Ernst & Young had sold Esrey and LeMay were invalid. Although neither executive took any steps to satisfy his tax liabilities, both disclosed the problem to Sprint's Board of Directors in late 2000.  In December 2000, Sprint and Ernst & Young approached the SEC for guidance as to whether Sprint could void the option exercises, thereby nullifying the tax liability.  The SEC advised Sprint that doing so would result in a loss of the tax deductions Sprint had taken upon the options exercises, and that Sprint would have to restate its earnings, refile its tax returns, and pay back taxes, at a time when its cash was limited.  Id. at *2.

However, rather than disclose these facts to investors, defendants allegedly "boasted" about the expected continued employment of Esrey and LeMay.  A Proxy Statement filed on March 15, 2001 stated that Sprint had entered into new employment contracts with Esrey and LeMay, each dated February 26, 2001, designed to insure their long-term employment with Sprint, to provide competitive compensation, and to link their compensation to shareholder value.  Id. at *3.

United States District Court

For the Northern District of California

1    In late 2001, Esrey and LeMay applied for and received amnesty from the IRS with

2    regard to any penalties, although they were still on the line for the taxes owed.  By this

3    time, however, Esrey and LeMay could not sell their shares to cover their potential tax

4    liability because the stock price had declined dramatically.  During 2002, Sprint's Board of

5    Directors held over 20 meetings devoted to discussing the tax problem faced by Esrey and

6    LeMay.  Nevertheless, Sprint continued to tout the long-term employment prospects of

7    Esrey and LeMay in its public statements.  Id. at *3-4.

8    In June 2002, Sprint's Board learned that the IRS had begun formally investigating

9    Esrey and LeMay in connection with their use of the tax shelters.  The Board sought legal

10   advice, and in October 2002, counsel recommended that Esrey and LeMay be dismissed.

11   During this time, the Board also had an executive search firm searching for a new CEO.

12   Nevertheless, the defendants still did not disclose to the public any information regarding

13   the tax problems faced by Esrey and LeMay.  On January 29, 2003, the Wall Street Journal

14   reported that Esrey and LeMay were leaving Sprint.  In response to the news, the stock

15   price fell considerably.  Id. at *4.

16   The plaintiffs filed suit, alleging that the statement concerning the long-term

17   employment of Esrey and LeMay, without any reference to the tax shelters and the

18   problems this situation posed for Sprint, was misleading because it was clearly predictable

19   that Sprint was going to lose Esrey and LeMay as a result of the tax avoidance problem.

20   The defendants argued that they had no duty to disclose information about the tax shelter

21   situation because plaintiffs had not alleged that the termination of Esrey and LeMay was

22   under "active and serious consideration" before Sprint was required to disclose the

23   information.

24   The court disagreed with defendants, finding that a reasonable inference could be

25   drawn from the allegations of the complaint that tax liabilities in excess of $100 million

26   would likely force Esrey and LeMay into "financial ruin," but that this argument could not be

27   resolved on a Rule 12(b)(6) motion.  Id. at *7.  The court also discounted defendants'

28   argument that they had no duty to disclose the possible or likely termination of Esrey and

United States District Court
For the Northern District of California

1  LeMay because Sprint's statements concerning the employment contracts did not foreclose

2  the possibility that the two executives might later be terminated.  The court found that the

3  statement that the employment contracts were "designed to insure" the long-term

4  employment of Esrey and LeMay could reasonably be read to convey the message that, at

5  least in Sprint's view, the long-term employment of Esrey and LeMay was certain.  Id. at *8.

6  Plaintiff argues that in the present case, FoxHollow "repeatedly highlighted the value

7  of its senior management and long term compensation packages intended to keep them at

8  the company," and also "stressed to investors that its future success depended on the

9  retention of management which the [C]ompany sought to retain."  Plaintiff contends that the

10  Proxy Statement "even included a summary compensation table for its senior executives,"

11  which indicated that Thomas, Martin, and Hoffman had received raises, bonuses, and stock

12  options, and that FoxHollow viewed the options as "long-term compensation" designed to

13  ensure the long-term employment of its management.

14  Plaintiff claims that because FoxHollow described the stock options as "Long Term

15  Compensation Awards," the Company obviously viewed them as "long-term compensation"

16  designed to ensure the long-term employment of its management.  Thus, according to

17  plaintiff, defendants' statements "reasonably led" investors to conclude that FoxHollow

18  desired and intended to retain management and had no intention of terminating senior

19  management.  Plaintiff asserts that FoxHollow's decision not to disclose the alleged plan to

20  purge management constituted a material omission.

21  The court finds, however, that the facts of the present case are distinguishable.  In

22  Sprint, the company specifically represented that the employment contracts were intended

23  to "insure" the "long-term employment" of Esrey and LeMay, and the court found that this

24  statement could have reasonably led an investor to conclude that the termination of the two

25  executives' employment was not an option from Sprint's viewpoint.  In this case, by

26  contrast, the statements involved nothing more that general praise for the workforce and

27  some unexceptional compensation disclosures.  No one at FoxHollow ever said that the

28  Company intended to "insure" the long-term employment of Thomas, Martin, or Hoffman.

37

United States District Court

For the Northern District of California

1   Rather, the Company repeatedly said that all its employees were "at will" and could leave at

2   any time.[13]

3        As with the pre-class period statements, plaintiff has identified no statements in the

4   October 26, 2005, conference call that created a duty to disclose Simpson's "edict" to

5   management.  It is common for a company to make general statements praising its

6   workforce and noting the importance of its employees to its performance.  The statements

7   "We couldn't be happier," and "[W]e are all energized by the new Hawks that are coming in

8   with the mindset of taking this opportunity to the next level," are nothing more than vague

9   and unspecific assertions of corporate optimism.  General positive statements do not give

10  rise to a duty to disclose the details of internal corporate disputes.  See Kane v. Madge

11  Networks N.V., 2000 WL 33208116 at *9 (N.D. Cal., May 26, 2000).

12       Nor has plaintiff alleged facts to support the claims based on the December 12,

13  2005, and January 9, 2005, statements.  With regard to the assertion that the December

14  12, 2005, statements were misleading because they omitted to say that Thomas had been

15  "forced to resign" for failing to "implement the LuMend acquisition back in August 2005,"

16  plaintiff has alleged no facts showing that Simpson did fire Thomas, or that he in fact had

17  the power to do so.  Indeed, as to the latter point, the court commented at the hearing on

18  the motion to dismiss the CAC that plaintiffs had not explained how Simpson had the power

19  to fire a chief executive officer on his own.  The FAC has not remedied this deficiency.

20       The statement of January 9, 2005, that "[w]e are confident in the abilities of the

21  senior management already in place," did not name any specific employee, and is far too

22  general and vague to support a federal securities claim.  No reasonable investor would

23  conclude, on the basis of such a general statement of optimism and praise, that FoxHollow

24  would not make any management personnel changes in the future.

25       The FAC alleges, without factual detail, that a close relationship existed between

26  _____

27       [13]   Moreover, as noted above, Thomas, Martin and Hoffman were not the only
    executives who received raises and bonuses; and FoxHollow's compensation policy provided
28  for the issuance of stock option grants to other FoxHollow employees, as well as to executive
    officers.

United States District Court

For the Northern District of California

1    Simpson and FoxHollow's directors.  These allegations do not show, however, that

2    Simpson controlled the Board of Directors, or that he, himself, could fire Thomas.  Based

3    on the facts alleged in the FAC, it is equally plausible that Thomas decided to quit because

4    he no longer wished to work with Simpson, as it is that Simpson engineered Thomas'

5    "firing."

6         Moreover, if it were true that Simpson controlled the Board, he would have had no

7    need for Martin, Hoffman, or Trigg to "sign off" on the LuMend transaction.  None of those

8    three was a Board member, and the FAC alleges no facts showing that they played even

9    the smallest role in any decision by the Board to approve or reject the LuMend transaction.

10   Either Simpson controlled the Board and therefore did not need Martin, Hoffman, or Trigg

11   to "sign off" on the LuMend transaction, or Simpson did not control the Board, and therefore

12   lacked the power to fire Thomas.

13        Plaintiff alleges that Simpson told Thomas on August 28, 2005, that if the LuMend

14   transaction was not closed "by the end of the week," he would ask for his resignation and

15   that Simpson "had the power to issue and enforce this threat."  Yet, the transaction was <u>not</u>

16   closed within one week, and there is no allegation that Thomas was asked to resign at that

17   time.  Even after another entity purchased LuMend, Thomas continued to serve as CEO,

18   for several months.  Based on the allegations in the FAC, it is reasonable to conclude that

19   Simpson did not have sufficient control of the Board to force an acquisition of LuMend,

20   because the acquisition never went forward.  Thus, there is no basis upon which to

21   conclude that Simpson had the ability unilaterally to fire Thomas.

22        2.    Scienter.

23        Defendants contend that the FAC fails to meet the heightened standard for pleading

24   the required state of mind for a claim under § 10(b) and Rule 10b-5.  Under the PSLRA,

25   whether alleging that a defendant "made an untrue statement of material fact" or alleging

26   that a defendant "omitted to state a material fact," the complaint must, with respect to each

27   alleged act or omission, "state with particularity facts giving rise to a strong inference that

28   the defendant acted with the required state of mind."  15 U. S.C. § 78u-4(b)(2).

1    In the Ninth Circuit, the required state of mind is " deliberate or conscious

2 recklessness." In re Silicon Graphics, 183 F.3d at 979.  Mere motive and opportunity are

3 not enough.  Id.  Because falsity and scienter in securities fraud cases may be inferred from

4 the same set of facts, the Ninth Circuit frequently incorporates the falsity and scienter

5 requirements into a single inquiry.  See America West, 320 F.3d at 932.

6    On a Rule 12(b)(6) motion to dismiss, when considering whether plaintiffs have

7 shown a strong inference of scienter, "the district court must consider all reasonable

8 inferences to be drawn from the allegations, including inferences unfavorable to the

9 plaintiffs." Gompper v. VISX, Inc., 298 F.3d 893, 897 (9th Cir. 2002) (noting tension

10 between customary latitude granted plaintiff on a Rule 12(b)(6) motion to dismiss and

11 heightened pleading standard set forth under the PSLRA).  Put another way, "a court must

12 consider plausible nonculpable explanations for the defendant's conduct, as well as

13 inferences favoring the plaintiff."  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S.Ct.

14 2499, 2510 (2007).

15    In short, the court must consider all the allegations in their entirety in concluding

16 whether, on balance, the complaint gives rise to the requisite inference of scienter.

17 Gompper, 298 F.3d at 897; see also Tellabs, 127 S.Ct. at 2509 (the inquiry "is whether all

18 of the facts alleged, taken collectively, give rise to a strong inference of scienter, not

19 whether any individual allegation scrutinized in isolation, meets that standard").  The

20 inference of scienter

21       must be more than merely "reasonable" or "permissible" – it must be cogent
        and compelling, thus strong in light of other explanations.  A complaint will
22      survive . . . only if a reasonable person would deem the inference of scienter
        cogent and at least as compelling as any opposing inference one could draw
23      from the facts alleged.

24 Tellabs, 127 S.Ct. at 2510.

25    Because falsity and scienter in private securities fraud cases are generally inferred

26 from the same set of facts, courts generally incorporate the dual pleading requirements of

27 15 U.S.C. §§ 78u-4(b)(1) and (b)(2) into a single inquiry.  Ronconi v. Larkin, 253 F.3d 423,

28 429 (9th Cir. 2001); see also In re Read-Rite Corp., 335 F.3d 843, 846 (9th Cir. 2003).

United States District Court

For the Northern District of California

40

United States District Court
For the Northern District of California

1    Defendants argue that because the FAC fails to allege particular facts that

2    demonstrate that defendants made any statements that were materially misleading at the

3    time they were made, the FAC also fails to strongly suggest actual intent to make

4    misleading statements.  Defendants contend that the FAC adds no new allegations creating

5    an inference of scienter, noting that plaintiff pleads the same "Additional Scienter

6    Allegations" as in the CAC.

7    In addition, defendants argue that the new allegations regarding purported

8    statements by three anonymous "Executive Employee Witnesses" do not raise an inference

9    of scienter.  Defendants assert that these statements describe isolated instances of

10   management disharmony and provide no evidence that defendants intentionally made

11   misleading statements or omissions.

12   Moreover, defendants argue, even if these allegations were relevant, they would still

13   be insufficient to raise a strong inference, because allegations relying on information

14   provided by unidentified "witnesses" must identify each such witness' job duties and

15   responsibilities, and must provide corroborating information sufficient to support a

16   reasonable conviction in the informant's basis of knowledge and how each informant came

17   to learn of the information attributed to him or her.  Defendants argue that the FAC does not

18   even come close to meeting this standard, as plaintiff omits all identifying information

19   regarding his confidential sources.

20   Defendants contend that plaintiff not only fails to plead facts raising a strong

21   inference of scienter, but also fails to even plead particular facts supporting his version of

22   events.  Defendants note that at the September 6, 2007, hearing on the motion to dismiss

23   the CAC, the court observed that plaintiff had not alleged any facts showing how Simpson

24   was able to "fire" Thomas, or even that Thomas had been fired.

25   Defendants assert further that plaintiff provides no support for the allegation that the

26   alleged refusal of Martin, Hoffman, and Trigg to "sign off" on the LuMend transaction had

27   any effect on the proposed merger.  Defendants contend that plaintiff pleads no facts

28   suggesting that the LuMend transaction (a proposed corporate merger) depended on the

41

United States District Court

For the Northern District of California

1   consent of any of these executives, none of whom were members of FoxHollow's Board of

2   Directors.  Defendants note that plaintiff does not allege that any of these executives made

3   any presentations to the Board regarding LuMend, or played any role whatsoever in

4   approving the acquisition of LuMend.

5        Finally, defendants argue that the court should infer a lack of scienter from the fact

6   that defendants retained the vast majority of their FoxHollow shares during the class

7   period.  Specifically, defendants contend that the court should infer from Simpson's minimal

8   stock sales during the class period that he lacked the intent that plaintiff ascribes to him.

9        Defendants contend that the facts here strongly support an inference that

10  defendants did not think there any material information was being withheld, as Simpson

11  sold only 5% of his FoxHollow shares during the proposed class period.  They argue that if

12  defendants had engaged in a fraud on the market, one would expect to see substantially

13  greater sales during the period that FoxHollow's shares were allegedly overvalued.

14  Instead, Simpson held onto 95% of his shares during that time.

15       In opposition, plaintiff contends that the FAC adequately alleges that defendants

16  acted with scienter, and asserts that the FAC added over 30 new paragraphs alleging

17  Simpson's knowing misconduct, and added further detail and particularity to other

18  paragraphs.[14]

19       Plaintiff also takes issue with defendants' assertion that the FAC merely "repeats"

20  the claim that Simpson "had the power to issue and enforce his threat" to fire Thomas,

21  without alleging how Simpson would have been able to fire Simpson on his own.  Plaintiff

22  asserts that the FAC alleges that Simpson had been intimately involved with FoxHollow

23  from its inception, having founded the Company in 1996, having served on the Board of

24  _____

25       [14] Plaintiff asserts that FAC ¶¶ 7, 9-11, 51, 53-56, 61, 64, 66-74, 76, 78, 79, 81, 82, 84-
     86, and 88-90 are the new paragraphs, and that ¶¶ 12-14, 47-49, 50, 65, and 75 have added
26   detail.  Apart from citing these 39 paragraphs, plaintiff does not explain how the allegations
     differ from those in the CAC.  The court notes that the "Statement of Facts" in the FAC begins
27   with ¶ 35, and runs to ¶ 98.  However, the portion of the "Facts" section pertaining to the class
     period does not begin until ¶ 72.  Any addition of new particularized facts to the portions of the
28   complaint that relate to pre-class-period allegations has no bearing on whether plaintiff has
     stated a claim under the Exchange Act.

United States District Court

For the Northern District of California

1  Directors from 1996 to the present, having served as President from 1996 to 1997, having

2  served as a paid consultant from 2004 to 2005, and having served as CEO from January

3  2005 to the present; that at the time Simpson made his "threat" to the Board of Directors,

4  he was serving as Chairman of the Board and was FoxHollow's largest individual

5  shareholder;[15] that Simpson had "selected every member of FoxHollow's Board of

6  Directors," appointing "family members and close friends" to the position;[16] and that

7  Simpson, as Chairman of the Board, plainly had the ability to "orchestrate[ ] the removal of

8  Thomas, Martin, and Hoffman," as alleged in the FAC.

9       With regard to defendants' arguments concerning the confidential witnesses, plaintiff

10 asserts that the FAC pleads sufficient facts to support the probability those witnesses

11 possessed the information alleged.  Plaintiff contends that because the confidential witness

12 were not only employees, but also executive officers of FoxHollow, they had direct

13 knowledge of the Company's operations, its consideration of LuMend, the Board

14 conversations with executive staff and executive management termination decisions and

15 disclosures.  Indeed, according to plaintiff, these witnesses were "parties" to the

16 conversations described in the FAC, and therefore provided reliable information regarding

17 what transpired at FoxHollow.

18      Plaintiff contends that the FAC establishes scienter by showing that Simpson

19 intentionally or recklessly concealed material information from the investing public.  Plaintiff

20 asserts that a strong inference arises that information was intentionally concealed by

21 Simpson because it was his decision to "purge" management.  Plaintiff also argues that the

22

23     [15] According to FoxHollow's April 29, 2005, proxy statement, Simpson owned 7,926,706
24 shares, or 34.4%, of the Company's stock.  By the time of the April 28, 2006, proxy statement,
he owned 5,973,355 shares, or 24%, of the Company's stock.

25     [16] The FAC alleges in ¶ 73 that Simpson's "family members and close friends occupied
26 positions on FoxHollow's executive management team and followed his directions," and that
Simpson "selected every member of FoxHollow's Board of Directors."  FAC ¶ 73.  The FAC
27 does not allege that Simpson "appointed family members and close friends" to the Board.
Moreover, apart from asserting that Simpson had ties to Rohlen, his son-in-law, and to
28 Ferguson, Rohlen's brother-in-law – neither of whom is alleged to have been a member of the
Board of Directors – plaintiff does not identify any other "family members and close friends."

United States District Court

For the Northern District of California

1   fact that Simpson sold only a small percentage of his stock during the class period is not

2   dispositive in determining scienter.  Plaintiff contends that Simpson's motive was his

3   "vindictive desire to purge key management who opposed him," not to make profits from

4   insider trading.

5          The court finds that plaintiff has not alleged facts creating a strong inference of

6   scienter.  As an initial matter, the FAC fails to allege particularized facts that demonstrate

7   that defendants made any statements that were misleading at the time they were made, or

8   that they omitted to state any material fact necessary to make statements not misleading.

9   The cited public statements never rise beyond the level of general remarks in praise of the

10  Company's workforce, and the additional allegations from the confidential witnesses reflect

11  nothing more than internal discord regarding the proposed LuMend transaction.

12         Moreover, the allegations based on information from the confidential witnesses do

13  not meet the standard followed by the Ninth Circuit.  In pleading fraud under the PSLRA,

14  plaintiffs may rely on anonymous sources for information, so long as they plead

15  "corroborating details" when allegations are based on non-public information.  In re Silicon

16  Graphics, 183 F.3d at 985; see also In re SeeBeyond Techs. Corp. Sec. Litig., 266 F.Supp.

17  2d 1150, 1159 (C.D. Cal. 2003).

18         "[P]ersonal sources of information relied upon in a complaint should be 'described in

19  the complaint with sufficient particularity to support the probability that a person in the

20  position occupied by the source would possess the information alleged.'"  Nursing Home

21  Pension Fund, Local 144 v. Oracle Corp., 380 F.3d 1226, 1233 (9th Cir. 2004) (quoting

22  Novak v. Kasaks, 216 F.3d 300, 314 (2nd Cir. 2000)); see also In re Daou, 411 F.3d at

23  1015.  When plaintiffs rely on facts beyond the information provided by the confidential

24  witnesses, they need not name their sources as long as the additional facts provide an

25  adequate basis for believing that the defendants' statements were false.  Nursing Home,

26  380 F.3d at 1015.

27         As noted above, plaintiff asserts that Executive Employee Witnesses 1, 2, and 3 had

28  "direct knowledge" of FoxHollow's operations, the Company's consideration of LuMend,

United States District Court

For the Northern District of California

1   Board conversations with executive staff members about LuMend and FoxHollow's CEO

2   Robert Thomas, and executive management termination decisions and disclosures.

3   However, apart from asserting that these witnesses had "direct knowledge" of general

4   subject areas, plaintiff provides no details about these witnesses confirming that they were

5   in a position to know what plaintiff claims they knew.

6         Plaintiff argues that these witnesses should be considered reliable simply by virtue

7   of the fact that they were "executives."  But there are no corroborating details pled in the

8   FAC that provide any indicia of reliability.  For example, while plaintiff argues in his

9   opposition that the statements from the confidential witnesses were based on their own

10  personal knowledge, the FAC omits any statement confirming that a particular witness

11  actually was present in the room when the meetings described were taking place.

12        In any event, even with the allegations of facts attributed to these witnesses added

13  to the mix, plaintiff still fails to state a claim for securities fraud.  The statements attributed

14  to the confidential witnesses simply confirm that Simpson disagreed with certain FoxHollow

15  executive officers regarding the proposed acquisition of LuMend.  The statements do not

16  support a strong inference of the required mental state.

17        Finally, under the circumstances presented here, the fact that Simpson retained

18  most of his stock militates against an inference of scienter.  It is true, as plaintiff asserts,

19  that scienter can be established even if a particular defendant did not sell stock during the

20  class period.  See America West, 320 F.3d at 944.  In this case, however, plaintiff claims

21  that "Simpson's motive was his vindictive desire to purge key management who opposed

22  him, not insider trading profits."  Pltf's Opp. at 24 n.2.

23        Thus, if Simpson had no motive to keep the price of the stock high, but wanted only

24  to retaliate against certain executives, he had no intent to defraud shareholders and plaintiff

25  can't state a claim for securities fraud.  See, e.g., In re Wet Seal, 518 F.Supp. 2d at 1177-

26  78 (lack of tangible personal benefits from alleged scheme weighs against inference of

27  scienter), and cases cited therein.  The fact that Simpson sold little stock during the class

28  period simply reinforces the inference that he lacked the requisite state of mind.

1    Because plaintiff has not established that defendants had any duty to disclose the

2    internal dispute over the proposed LuMend acquisition, including any squabbles between

3    Simpson and Thomas, Simpson and Martin, Simpson and Hoffman, or Simpson and Trigg;

4    and because plaintiff fails to allege facts sufficient to create a strong inference of scienter,

5    the court finds that the motion to dismiss must be GRANTED.[17]

6                                          **CONCLUSION**

7    In accordance with the foregoing, the motion to dismiss is GRANTED.  The court

8    previously put plaintiff on notice of the defects in the CAC, and the FAC is similarly

9    inadequate in alleging both falsity and scienter.  Because the court finds that further

10   amendment would be futile, the dismissal is WITH PREJUDICE.

12   **IT IS SO ORDERED.**

13   Dated: May 27, 2008                      _____

14                                            PHYLLIS J. HAMILTON
                                              United States District Judge

---

28      [17]  The § 20(a) claim is dismissed because plaintiff has not stated a claim for primary
liability.  <u>Heliotrope</u>, 189 F.3d at 978.